349 So.2d 918 (1977)
Frances Joann Hill HIGGINS and Phillip Higgins
v.
Matthew G. JOHNSON et al.
No. 11395.
Court of Appeal of Louisiana, First Circuit.
July 11, 1977.
Rehearings Denied August 24, 1977.
Writs Refused October 14, 1977.
*920 Elliott W. Atkinson, Jr., Baton Rouge, for plaintiff-appellant Frances Joann (Hill) Higgins.
Robert J. Vandaworker, Baton Rouge, for defendant-appellee Matthew G. Johnson et al.
Joseph F. Keogh, Baton Rouge, for defendant-appellee Home Ins. Co.
Before LANDRY, EDWARDS and COLE, JJ.
LANDRY, Judge.
Plaintiffs (Appellants), husband and wife, appeal from a jury verdict judgment rejecting their claims in tort against defendants Chart House, Inc. (Chart House), holder of the Burger King franchise for the State of Louisiana; Matthew G. Johnson (Johnson), employee of Chart House; Liberty Mutual Insurance Company (Liberty); and, Home Insurance Company (Home), insurers of Chart House. Appellants' demands arise from an intersectional automobile collision in which a left turning vehicle being driven by Mrs. Higgins was struck by a truck belonging to Chart House and being operated by Johnson within the scope and during the course of his employment. Mrs. Higgins sues for serious personal injuries resulting in permanent partial disability and for the death of her guest passenger mother, Jessie Hill (Decedent), including funeral expenses. Mr. Higgins sues for special damages for the loss of his vehicle, medical expense and funeral expenses for Mrs. Hill. We reverse and render judgment for Appellants.
The accident occurred at about 6:30 A.M., January 5, 1974, at the intersection of Airline Highway (a major four lane highway) and Beechwood Drive (a minor two lane roadway) in the City of Baton Rouge. Airline at that point runs east and west; Beechwood runs north to south, intersecting Airline at somewhat of a sharp angle. The east and westbound lanes of Airline are each 10½ feet wide. The opposing lanes are separated by a wide neutral ground which has been recessed to form six foot wide "islands" on each side of the intersection, thus creating a third lane for east and westbound motorists desiring to turn left to proceed north or south from Airline onto Beechwood. These left turn lanes commence about 100-150 feet from the intersection and are 10 feet wide.
The intersection is controlled by ten traffic signals operating in sequence as follows: Two lights control traffic on the through eastbound lanes of Airline and two control through westbound Airline vehicles; one controls left turns for eastbound vehicles turning north onto Beechwood; one governs left turns for westbound motorists turning south onto Beechwood; two control Beechwood north of Airline; and two control Beechwood south of the intersection. The signals are designed and coordinated to permit traffic movement on a demand flow basis, favoring Airline. The left turn lanes on Airline and all lanes of Beechwood are each provided with a demand switch which is activated when a vehicle crosses a pressure plate or treadle installed in the roadbed. In the left turn lanes of Airline, these treadles are located fifty-five feet from the end of each island. When no demands are made from either of the left turn Airline lanes or from Beechwood traffic, the lights remain favorable for Airline traffic in both directions. If a demand is made on Beechwood, the flow switches from Airline to Beechwood when the programmed cycle for Airline is completed, and, if no other demands intervene, the flow reverts to Airline. When, however, there is a demand from the left turn lanes *921 of Airline but no demand on Beechwood, the flow signal of Airline turns to amber or caution, then red or stop for east and westbound vehicles on Airline and the green or left turn arrows activate, thus affording protected left turns by Airline traffic. A demand on Beechwood with simultaneous demands by both left turn Airline lanes results in the green or flow signals for Airline going to red or stop; the signal for Beechwood becomes green, then amber, leaves the green for Beechwood, activates both left turn arrows on Airline with the signals for east and westbound Airline traffic remaining red. An Airline eastbound left turning vehicle activates the treadle to obtain a green left turn arrow with a simultaneous red or stop signal for westbound Airline traffic. During such a sequence, however, eastbound through traffic on Airline has a green signal unless a westbound vehicle activates the treadle for a left turn south onto Beechwood. The length of the green or flow signals for both east and westbound left turns from Airline or for Beechwood traffic crossing Airline in either direction depends on the number of cars crossing each treadle. The amber or caution signal, in either direction, is approximately four seconds.
Mrs. Higgins was proceeding easterly on Airline driving a white 1964 Chevrolet Belaire. She was accompanied by her mother who occupied the right front seat of the car. Johnson, traveling west on Airline, was driving a ten wheel, fourteen foot Burger King van. As Mrs. Higgins was turning left across the westbound Airline lanes and heading northeast at a rather sharp angle, her car was struck on its right front door by the right front of defendant's truck. Mrs. Higgins contends she commenced her left turn on a favorable green arrow and was struck by defendant's vehicle before she could complete her turn.
The following issues are presented for resolution: (1) Whether the trial court erred in its instruction to the jury as to the legal consequences of a motorist entering an intersection immediately following a light change without allowing sufficient time for preempting cross traffic to clear; (2) Whether the trial court erred in its instruction to the jury concerning the legal consequences of a motorist's failure to look ahead and see what he can see or could have seen by the exercise of due diligence; (3) Refusal of the trial court to give requested jury instruction regarding application of the doctrine of last clear chance; and, (4) Whether the jury verdict was patently erroneous as a matter of fact.
Mrs. Higgins was on her way to a beauty parlor for standing Saturday appointments she and her mother had had for four years. She customarily traveled Airline to reach Beechwood and was familiar with the intersection. The weather afforded good visibility despite the existence of a slight haze. All vehicles on the road were using their headlights. As Mrs. Higgins approached the intersection, she pulled into the eastbound left turn lane and stopped because the light was red. While first in line waiting for a green turn arrow, she saw a truck parked facing west on the north shoulder of the opposing westbound lanes and also noted an officer standing beside the truck. Next, she noticed the truck proceed westbound through the intersection. Following this, the police car left the shoulder of the road, crossed the westbound lanes of Airline, and entered the westbound left turn lane behind a pickup truck already in that lane. She then observed the lights turn red for through westbound Airline lanes; the reflection of an amber light on Beechwood south or to her right; and a left turn arrow on the light controlling her lane. She proceeded to make her turn and has no recollection of what ensued until she was being attended later by a police officer after her vehicle came to rest. She did not see the westbound truck. At the scene, she told the investigating officer she turned on a green arrow at which time the signal was green for through eastbound Airline cars. In a statement given four days after the accident, she related that when she stopped in the left turn lane, the lights were green for through eastbound Airline traffic, the through light turned to amber, then red, then immediately back to green and her left *922 turn arrow appeared. Defendants maintain this latter sequence is impossible except for a malfunction.
Johnson had been traveling westerly in the outside lane of Airline until he reached a point about one block from the intersection. He then switched to the inside lane, traveling at about forty miles per hour. Observing that the light was red for through westbound traffic, he shifted from sixth to second gear and slowed to a speed of about five miles per hour in anticipation of the light turning green. While he was not concentrating on the light, he frankly admitted he was definitely looking at the light and controlling his speed to avoid coming to a complete stop, but he could have stopped before entering the intersection had not the light turned green. He did not know when the light turned green, neither did he see a caution signal. When he was about fifty feet from the intersection, the light turned green for westbound Airline traffic. He then shifted to third gear and entered the intersection at 20 to 25 miles per hour. He first saw the Higgins car when it was in the center of his lane of travel and at which time it was only about five feet away. He did not observe any other cars either traveling or stopped in the eastbound lanes of Airline. No vehicle was ahead of him in the inside westbound lane of Airline. He did, however, note several cars to his right in the outside westbound lane of Airline and also noted the police car stopped in westbound left turn lane to his left. When he saw the Higgins car turning across his path, it was too late for him to take evasive action.
The accident was investigated by Officers Malcolm Kirk Devall and Charles Raymond Wallace, who occupied the aforementioned police car, and who were in route to report to a nearby station to commence their daily shift. After ticketing a vehicle, which they stopped about seventy-five to one hundred yards east of the intersection, they entered the left turn westbound lane with Officer Devall driving. Devall intended to make a U turn to proceed east along Airline. He pulled into the left turn lane behind a pickup truck waiting for a left turn signal. Officer Devall noted a green signal for westbound Airline traffic and a red signal for left turn vehicles traveling west. While waiting for a go signal he noted, out of the corner of his eye, a large truck inching up on his right toward the intersection. On the green left turn signal, the truck ahead made a left turn and he followed. After negotiating about three-quarters of his left turn, he heard a crash behind him. Looking in his rear view mirror, he noted that cars in the westbound Airline lane were starting to move into the intersection. He then backed his car across the westbound lanes to protect the accident from traffic. He did not know what color light faced through westbound Airline traffic when his green arrow appeared. When he began his turn, he saw no oncoming through traffic moving east on Airline.
Devall stated that Johnson told him Mrs. Higgins ran a red light. Mrs. Higgins explained that she had a green left turn arrow when she began her turn from a stopped position, and that when she made her turn, eastbound traffic on Airline had a green signal. He found that the collision occurred in the center of the inside westbound lane of Airline at a point eighteen feet west of the end of the westbound island and fifteen feet east of the end of the eastbound island. He also found the right bumper of the truck struck the right front door of the Higgins car, knocking that vehicle into the outside westbound lane where it came to rest. The truck came to rest in the inside westbound lane in which it had been traveling.
According to Officer Wallace, his vehicle was faced with a red turn signal as it waited in the left turn lane, at which time westbound traffic on Airline had a green signal. Just before his left turn signal turned to green, he noted Mrs. Higgins' vehicle in the opposing left turn lane. As the police car was negotiating its left turn Wallace noted, out of the corner of his eye, a large truck coming up on his right, at which time the signals for through westbound Airline traffic were red. He was not certain, however, whether the westbound *923 lights of Airline were red when the police car entered the intersection.
Frazier W. Mann, proceeding easterly on Airline, stopped his vehicle in the right outside lane behind either one or two cars already stopped in that lane for a red light. When the lights turned green for westbound vehicles, he noted a truck in the inside lane abreast of his own vehicle, about 20 feet from and moving toward the intersection, at which time he saw the Higgins car turning left into the intersection. He observed no vehicles ahead of the truck in the inside westbound lane. He sensed that a collision was inevitable and so exclaimed to his guest passenger son. He also stated that when the truck was passing on his left, none of the cars in the outside lane moved until after the accident, when the police directed traffic down an adjacent service road. Mann estimated the speed of defendant's truck at 30 to 35 miles per hour at the moment of impact.
Robert Wall, owner of a service station situated at the southeast corner of the intersection, was seated behind a desk in his glass enclosed office, when the accident occurred. At the sound of impact, he looked up and noted that all lights facing him were red, namely those controlling westbound traffic on Airline and northbound vehicles on Beechwood. He was not certain as to the color of the signal for left turn traffic on Beechwood.
Appellant's theory of the case is that Mrs. Higgins commenced her turn on a green or go arrow signal at a time when the signals were red or stop for east and westbound through traffic on Airline, and that Johnson ran a red light. Alternatively, Appellants contend Mrs. Higgins preempted the intersection by entering on a green light which changed to red after her entry, and that Johnson subsequently entered on a green light, but failed to yield to her preemption. In the further alternative, Appellants plead last clear chance.
Defendants urge that Mrs. Higgins entered the intersection on a red light. They so maintain because the record shows that the green arrows for east and westbound left turns on Airline do not necessarily activate simultaneously in all instances. Defendants theorize that Mrs. Higgins saw the opposing pickup truck and police car turning left, and assumed she also had a green turn arrow, but in fact her light was red.
The jury was thus presented totally conflicting versions regarding pertinent facts determinative of the outcome of this litigation. Appellants concede the general rule that the factual determinations of a jury are not to be disturbed on appeal save in case of manifest error. Appellants maintain, however, certain erroneous rulings by the trial court, and that the court's failure to give certain requested instructions confused the jury, and prevented the jury's consideration of the evidence in the light of principles of law applicable herein.
First, Appellants urge the trial court instructed the jury improperly concerning the legal consequences of a motorist's failure to allow preempting traffic to proceed safely through a controlled intersection. The statutory duty involved is set forth in LSA.R.S. 32:232, which pertinently provides:
"Whenever traffic is controlled by traffic-control signals exhibiting the words `Go', `Caution', or `Stop', or exhibiting different colored lights successively at a time, or with arrows, the following colors only shall be used and said terms and lights shall indicate and apply to drivers of vehicles and pedestrians as follows:
(1) GREEN alone, or GO:
(a) Vehicular traffic facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. But vehicular traffic, including vehicles turning right or left, shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection or an adjacent cross-walk at the time such signal is exhibited."
The trial court read the foregoing statute to the jury and added:
"Another part of the law says: `A motorist's duty to look ahead and observe never ceases and a motorist must see *924 what he can see and in legal contemplation should have seen with the exercise of due diligence.'
"The law also says: `The rule is that a motorist must not enter an intersection after a red light turns to green until sufficient time is allowed for cross traffic already legally in the intersection to clear. Preemption of an intersection entitling a motorist to proceed therein and to negotiate the same means an entry into the intersection with the opportunity of clearing the same without obstruction of the path of other vehicles operating under normal and reasonable circumstances and conditions.'"
Appellants concede the trial court gave the jury the proper basic legal principle governing preemption. On authority of Seaton v. Widlitze, 258 So.2d 390 (La.App. 4th Cir. 1972); Bettis v. Paulsen-Webber Cordage Corp., 217 So.2d 662 (La.App. 4th Cir. 1969); and Close v. Lumbermen's Mutual Casualty Company, 207 So.2d 571 (La. App. 3rd Cir. 1968), Appellants argue, however, the trial court erroneously declined the following requested instruction, which was essential to a full jury understanding of the legal duty of care owed by a motorist entering an intersection controlled by a traffic signal, to-wit:
"Our settled jurisprudence is that where traffic is controlled by an electric semaphore light, although a motorist generally may rely on the assumption that others will obey the traffic signals, he is guilty of negligence if he proceeds into an intersection immediately after a red light turns to green without allowing a reasonably sufficient time for vehicles in the intersection to clear the intersection, even if such vehicles are in the intersection in violation of the light."
As a general rule, when an electric semaphore signal turns green, a motorist crossing an intersection is no longer obligated to observe traffic facing a red or stop signal, and becomes obligated to observe traffic moving in the same or the opposite direction. He may rely on the assumption that other motorists will obey the traffic signal and stop. Bourgeois v. Francois, 245 La. 875, 161 So.2d 750 (1964); Central National Insurance Company of Omaha v. Bardsley, 256 So.2d 734 (La.App. 1st Cir. 1972); Hartford Accident and Indemnity Company v. Finley, 282 So.2d 830 (La.App. 1st Cir. 1973). The foregoing rule is not, however, without its exception. Our jurisprudence has repeatedly held that where a motorist on a favored street could have avoided an accident by the exercise of the slightest degree of care and observation, he will be deemed guilty of negligence constituting the proximate cause of a resulting accident. Bourgeois v. Francois, above; Rome v. S. D'Antoni, Inc., 246 So.2d 331 (La.App. 1st Cir. 1971).
Appellants complain that the foregoing instruction of the trial court, concerning a motorist's failure to see what could or should have been observed, was insufficient in that it did not include the legal consequences of such failure. Appellants maintain the trial court erred in failing to give the following requested charge which would have cleared this alleged deficiency:
"A motorist's duty to look ahead and observe never ceases, and a motorist must see what he can see and in legal contemplation does see, and his failure to see what he could have seen by exercising due diligence does not absolve him from liability and resulting injuries to others."
We find Appellants' position well taken. In disposing of this precise issue our Supreme Court, in Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975) stated:
"[T]here could hardly have been any more important legal principle for the consideration of the jury than that defendant's failure to see what he could have seen by the exercise of due diligence does not absolve him from liability. Indeed, this is the very principle of law which the jury was required to apply to whatever facts were established by the evidence. But the jury could not have applied that principle to the facts because it was not a part of the judge's charge to them."
*925 The adequacy of jury instructions by a trial court must be determined in the light of the instruction as a whole. Where issues of negligence are involved and the instructions given with regard thereto are found to be confusing and misleading, or to have omitted an essential principle or element, such instructions are insufficient and constitute legal error. LSA-C.C.P. Article 1792; Gonzales v. Xerox Corporation, above; Gros v. Louisiana Power and Light Company, 288 So.2d 364 (La.App. 4th Cir. 1974). The foregoing rule is based on the principle that a trial jury must accept the law as given it by the trial court, and apply that law to the facts of the case as the jury finds them. Litigants have the right to have the evidence weighed in the light of proper jury instructions; therefore such instructions will be deemed inadequate when there is no assurance that factual findings were made pursuant to a clear understanding of applicable legal principles. Bienvenu v. Angelle, 254 La. 182, 223 So.2d 140 (La.1969); Reeves v. Gulf States Utilities Co., 312 So.2d 118 (La.App. 1st Cir. 1975).
The jury heard evidence that the Higgins car was negotiating the intersection when the truck entered the intersection, and that the truck driver did not see the Higgins car until it was five feet away. Given these circumstances to weigh, along with conflicting testimony, the jury was not given proper instruction as to the consequences of the failure of the truck driver to observe what he could or should have observed by the exercise of due diligence.
Neither was the jury afforded opportunity to weigh the facts in the light of the rule that a motorist on a favored street will be deemed guilty of actionable negligence where, by the exercise of the slightest degree of care and observation, he could have avoided the accident. Bourgeois v. Francois, above.
Appellate review in civil cases extends to fact as well as law. La.Const.1974, Article 5, Section 10(B). In considering a jury verdict judgment rendered pursuant to erroneous jury instruction by the trial court, appellate review tends to involve trial de novo for all practical purposes. In such cases, the appellate court is, in effect, a court of original jurisdiction. Bienvenu v. Angelle, above. We deem the clear import of Angelle, above, and Gonzales, above, to be that, in cases of this nature, the manifest error rule proclaimed in Canter v. Koehring Company, 283 So.2d 716 (La. 1973) is inapplicable, and we so hold. Accordingly, we reach our own factual determinations without regard to the manifest error doctrine.
We find as a fact that Mrs. Higgins entered the intersection on a favorable green arrow and at a time when the signal light for westbound Airline through traffic was red. We also find Mrs. Higgins was in error when she stated four days following the accident that through westbound Airline traffic had a green signal when she began her turn on a green arrow. We so find because: (1) such a sequence is highly improbable although there is some evidence that this combination of signals could happen; (2) Officer Devall proceeded into the intersection on a green arrow while Mrs. Higgins was turning left from the opposite direction, a programmed sequence; and (3) Mr. Mann, a disinterested witness, testified Mrs. Higgins entered the intersection before the truck and that the truck got a green light just before it entered. We also find that Mrs. Higgins' favorable signal turned to red while she was in the process of negotiating the intersection; that she was lawfully in the intersection and had the right to complete her turn. We find, additionally, that the difference between the speed of the Higgins car, which moved from a standing position, and that of the truck, which did not stop because of the driver's anticipation of a light change, establishes beyond doubt that Mrs. Higgins' green turn signal appeared before Johnson got the green signal. These circumstances explain the fact that Mrs. Higgins, traveling at a slower speed, proceeded only fifteen feet into the intersection before the point of impact, whereas the truck was eighteen feet into the intersection at the point of impact. We find Mrs. Higgins free of negligence.
*926 We conclude Johnson was not maintaining that degree of care and lookout required of a motorist entering an intersection from a moving position immediately following change of a light from red to green. Johnson's own testimony establishes beyond question that he was more concerned with entering the intersection on a favorable light, without stopping his vehicle, than with maintaining the slightest degree of care regarding a motorist who may have been in the intersection. That Johnson did not see an oncoming vehicle clearly in sight convinces us of his failure to exercise the slightest degree of care.
Tort liability is based on duty to exercise care, the violation of which produces damages. LSA-C.C. Article 2315; Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970). LSA-R.S. 32:232 purports to protect motorists who preempt an intersection. Johnson's violation of the statute was a substantial factor without which the accident would not have occurred. It resulted in the damages upon which this action is based. His failure to see what he could and should have seen, by the exercise of the degree of care required, created the risk which caused Appellants' damages.
Mrs. Hill and Mrs. Higgins were both taken to a hospital at about 7:00 A.M., approximately 30 minutes after the accident. Mrs. Hill was attended by Dr. C. S. McConnell who found her in shock. She remained so until shortly after 12:00 noon when she died. She sustained fracture of the jaw on both sides, fracture of the clavicle, fracture of the fourth, fifth and sixth ribs on the right side, multiple fractures of the pelvic bone, a bruised scalp and severe scalp lacerations. She did not respond to shock treatment. She was given pain medication. She remained conscious and in pain until the last stages of her ordeal. Probable cause of death was listed as cardiac arrest induced by shock. Mrs. Hill, 71 years of age, had recently undergone successful gall bladder surgery from which she had recovered completely. Her personal physician considered her to be in general good health and estimated she could have lived an additional 10 years.
We value Mrs. Hill's survival claim at $12,000.00 and award Mrs. Higgins one third of said amount or $4,000.00 for this item of damages, pursuant to a stipulation between the parties.
Mrs. Higgins and her mother were exceptionally close. Decedent lived with her daughter prior to the daughter's marriage, and lived with Mrs. Higgins and her husband thereafter. As a member of the household, Decedent did most of the housework and cooked the family meals while Mrs. Higgins and her husband worked. Decedent accompanied her daughter constantly. We find Mrs. Higgins entitled to $15,000.00 for the loss of her mother.
Mrs. Higgins received initial emergency treatment consisting only of suturing of a laceration behind her right ear. The sutures were removed by her family physician, Dr. Herschel Dean, on January 11, 1974. On January 18, 1974, she returned to Dr. Dean complaining of neck discomfort. Dr. Dean prescribed muscle relaxants and pain medication. Since x-rays taken on the date of the accident revealed no fracture of the neck, Dr. Dean diagnosed the patient's condition as acute cervical strain. Dr. Dean saw Mrs. Higgins January 25, February 7, March 1, September 6, 1974, and March 10, 1975, for neck pain which had gradually worsened. He referred her to Dr. Francis McMains, orthopedic surgeon, whom Mrs. Higgins first visited on December 11, 1974.
Dr. McMains ordered planigrams which he interpreted as revealing a healed fracture through the facet of the lower set of C-5 on the left side. Examination revealed lateral rotation of the neck to the left to be practically zero and right rotation approximately 50% normal. He again saw Mrs. Higgins on July 9, 1975, and September 15, 1975, and found her range of neck motion unchanged. Dr. McMains found osteoarthritic degenerative changes in the lower facets of the patient's cervical spine. Because of this condition, she suffers considerable pain and discomfort upon prolonged *927 sitting or holding her head in one position. Dr. McMains considered this condition has resulted in a 25 to 30% total bodily disability which he deems permanent, inasmuch as Mrs. Higgins has shown no improvement since her first visit. He attributed this condition to the neck fracture which he found to have resulted from the accident.
Upon Dr. Dean's advice, Mrs. Higgins returned to her job as head cashier for a large chain store. Because of pain and difficulty with her neck, she could not work her usual full 40 hour week. She was demoted because her duties as cashier required bodily movements she could no longer achieve without considerable pain and discomfort. She cannot turn her head left to any degree, except by turning her entire body or turning from the waist. For such injuries, including past, present and future pain, suffering and inconvenience, we find an award of $40,000.00 to be adequate.
Mrs. Higgins' loss of earnings from the date of the accident until May, 1976 were computed at $5,032.12 by William P. Culbertson, Professor of Economics, L.S.U. His calculations were based on Mrs. Higgins' hourly wages during the period and the number of hours missed due to disability. Culbertson also computed Mrs. Higgins' loss of future wages on a 52 week year, allowing for an annual two week vacation and employing her last hourly wage of $5.30. He adjusted his figures to allow a 7½ annual increase in wages and then utilized a 6% discount. He thus found Mrs. Higgins, forty-three years of age, would earn a total of $286,193.00 total wages if employed until age 65, without any time lost for disability.
In awarding Mrs. Higgins loss of future earnings, we consider she has a permanent twenty-five to thirty per cent disability of the body as a whole. Such an award, however, cannot be determined with mathematical certainty and sound judicial discretion must be exercised after all pertinent factors are considered and weighed. McFarland v. Illinois Central Railroad Co., 241 La. 15, 127 So.2d 183 (1961); Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971). These include, among others, plaintiff's condition prior to injury, work record, previous earnings and probable future earnings had the disabling injury not occurred. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968). We find an award of $45,000.00 will compensate Mrs. Higgins adequately for loss of future earnings.
We also find Appellants are jointly entitled to recover $1,302.00 funeral expenses for Mrs. Hill and that Phillip Higgins, individually, is entitled to judgment in the sum of $300.00 for the loss of his automobile and $640.00 medical expense.
Expert witness fees for Drs. Dean and McConnell are fixed in the sum of $100.00 each, and that of Dr. McMains in the amount of $150.00 and taxed as costs herein. Expert witness fee for William P. Culbertson is hereby fixed in the sum of $300.00. No expert witness fee is due Larry Oubre, called by Appellants, because the witness was not qualified as an expert.
IT IS ORDERED, ADJUDGED AND DECREED THAT:
(1) The judgment rejecting Appellants' demands is reversed and set aside;
(2) Judgment is rendered herein in favor of Phillip and Frances Joann Hill Higgins, against defendants Chart House, Johnson, Liberty and Home, in solido, in the sum of $1,302.00;
(3) Judgment is rendered in favor of Phillip Higgins against the above named defendants, in solido, in the sum of $940.00;
(4) Judgment is rendered herein in favor of Frances Joann Hill Higgins against the above named defendants, in solido, in the sum of $109,032.12;
(5) Judgment is rendered herein awarding Appellants legal interests on all awards from date of judicial demand until paid;
(6) Expert witness fees for Drs. McConnell and Dean are fixed in the sum of $100.00 each and that of Dr. McMains fixed at $150.00 and taxed as costs herein;

*928 (7) Expert witness fee for William P. Culbertson is fixed in the sum of $300.00 and taxed as costs herein; and
(8) The above named defendants are cast for all costs of these proceedings.
Reversed and rendered.

ON APPLICATION FOR REHEARING
PER CURIAM.
All defendants-appellees have applied for rehearing alleging errors in our findings of fact and application of law. Appellee, Home Insurance Company, excess insurer of Appellees Chart House, Inc., complains of our holding it liable in solido with the primary insurer Liberty Mutual Insurance Company.
In our original opinion we stated that the witness Mann was traveling east on Airline whereas he was in fact proceeding west. We also found that Johnson should have observed a yellow or caution light before entering the intersection. There is nothing in the record to support the finding that a yellow or caution light was part of the signal sequence from a red to green change of light for through traffic on Airline. We quoted Mrs. Higgins as saying that when she entered the intersection, through westbound traffic on Airline had a green signal. She was actually referring to the through signal for eastbound vehicles.
None of these erroneous findings affect the outcome of this litigation. We reiterate the essence of our decree, namely, Mrs. Higgins entered the intersection on a favorable signal and defendant Johnson also entered on a go signal. Johnson, however, failed to exercise even the slightest degree of care toward a motorist lawfully in the intersection. His negligence in this respect was the sole cause of the accident.
Our more careful review of the record discloses that Home Insurance Company is an excess insurer whose exposure does not attach to any judgment less than $200,000.00. Accordingly, the judgment is amended to release Home Insurance Company from all liability herein. In all other respects the judgment is affirmed.
Rehearings by Appellees denied.