542 So.2d 544 (1989)
Coy V. WEBER, Widow of Farrel J. Weber, Jr., Individually and as Administratrix of the Estate of the Minor Children, Farrel J. Weber, III and Britian F. Weber
v.
CATERPILLAR MACHINERY CORPORATION, Caterpillar Tractor Company, ABC Insurance Company, XYZ Insurance Company and Boyce Machinery Corporation.
No. 88-CA-785.
Court of Appeal of Louisiana, Fifth Circuit.
March 15, 1989.
Rehearing Denied May 17, 1989.
*546 Robert M. Becnel, Daniel E. Becnel, Jr., Becnel, Landry & Becnel, LaPlace, for plaintiff-appellee Coy V. Weber.
C.G. Norwood, Jr., Keith W. McDaniel, Margaret Diamond, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, for defendant-appellant Caterpillar Inc.
James C. Murphy, Jr., Patricia A. McKay, Cornelius, Sartin & Murphy, New Orleans, for defendant-appellant Boyce Machinery Corp.
Thomas J. Eppling, Law Offices of Leon A. Aucoin, Metairie, for intervenors/appellees Bayou Steel Corp. and The Home Ins. Co.
Before KLIEBERT, BOWES and DUFRESNE, JJ.
KLIEBERT, Judge.
In this products liability case, Mrs. Coy V. Weber, individually and on behalf of her two minor children, sued Caterpillar Tractor Company, the manufacturer, and Boyce Machinery Corporation, the seller, for the wrongful death of her husband, Farrel J. Weber, Jr., who was killed while operating a forklift for his employer, Bayou Steel Corporation. Bayou Steel and its insurer, Home Insurance Company, intervened for reimbursement of worker's compensation benefits paid to the widow and minors (stipulated to be $38,560.00 as of June 8, 1988, the week before trial). In response to interrogatories a jury set damages at $200,000.00 for Mrs. Weber and $500,000.00 for each minor child and allocated fault at 70% to Weber and Bayou Steel (10% and 60% respectively) and 30% to the defendants, Caterpillar and Boyce (20% and 10% respectively). The trial court judgment provides that Caterpillar "was responsible for 20%" of the total damages of $1,200,000.00; Boyce "was responsible for 10%" of the total damages; Farrel Weber, Jr. "contributed to his own injury in the amount of 10%" and Bayou Steel "was 60% responsible for the accident." Thus Bayou Steel's reimbursement claim for worker's compensation benefits was reduced by 60%. Costs, including jury expenses and expert witness fees, were prorated amongst the parties "within the same limits of the assigned percentage of liability in the Jury verdict."
Caterpillar and Boyce appealed, assigning error to their being found at fault and in the amount of damages set. They also contend the trial judge committed reversible error in some of his evidentiary rulings and in making charges to the jury. Further, the defendants contend the conduct of the plaintiff's counsel resulted in an unfair trial for defendants. Bayou Steel also appealed and on appeal contends the trial judge erred in reducing the claim for reimbursement by 60% and casting it for 60% of the total costs. Plaintiff answered the appeal seeking an increase in the total damage award.
For the reasons hereinafter stated, we give no deference to the jury findings and set aside the trial court judgment. We also issue a decree absolving Boyce from fault and liability, finding Weber, Bayou Steel and Caterpillar at fault and allocating liability *547 to: Weber 50% and Caterpillar 50%. Further, we set the intervenor's claim for reimbursement at the same percentage of Weber's recovery in tort. This sum is to be paid with interest and by preference and priority out of the portion allotted to plaintiff. Judgment is rendered against Caterpillar in the appropriate amount with interest.

THE JURY VERDICT AND THE TRIAL COURT JUDGMENT
After the record was lodged but prior to oral argument, Caterpillar filed a motion to remand the case for a new trial. The motion was grounded in the contention only eight jurors concurred in finding the defendants liable whereas nine needed to concur to render a verdict. The record indicates the defendants requested the polling of the jury. In doing so the trial judge asked the compound question: "Did you find that Caterpillar contributed to Mr. Weber's death? Did you find that Boyce Machinery contributed to his death?" Each question had been propounded to the jury as an individual written interrogatory and answered "yes". Although four of the jurors (Nos. one, three, six and ten) are recorded as having responded "No" to the compound question, and La.C.C.P. Article 1797(B) requires nine to concur to render a verdict, no one raised an objection or requested a single question be asked and a response obtained as to the contribution of each defendant. The first objection raised was on the motion to remand. In response to the motion plaintiff's counsel hypothesized from answers to subsequent questions posed by the trial judge that only three jurors voted against liability on the part of Caterpillar and one juror voted against liability on the part of Boyce; hence, at least nine jurors supported the verdict. We cannot speculate on the jury's response. However, since it was unknown what the response would have been to the single question, we rejected the motion to remand without comment and let the merits of the appeal proceed to oral arguments.
In appellate brief and oral argument the issue was again raised. Further, Caterpillar strenuously contends the conduct of plaintiff's attorney in making deliberate misstatements of testimony or statements of facts not supported by the evidence or not in evidence, and the use of intemperate and/or inflammatory language and improper aspersions as to the character of witnesses, opposing counsel, and/or opposing parties, was sufficient grounds for a mistrial. Further, he contends these are justifiable grounds to reverse the lower court and grant a new trial. Additionally, Boyce's counsel urges error in the trial judge's procedure for charging the jury in that it: (1) refused to hold a conference on proposed jury charges despite a timely request, (2) failed to inform counsel prior to closing argument of the charges he would present to the jury, (3) refused to give any of the charges submitted by Boyce, (4) failed to give a charge explaining the standard of care required of a seller, and (5) failed to provide a written version of the charges or to require the court reporter to transcribe the charges. In brief and oral arguments, counsel for Caterpillar and Boyce adopted one another's contentions and arguments.
The record reflects that at the close of the case counsel requested "some information about the jury charges before closing arguments, sir, to know what to argue to the jury regarding the facts." The trial judge refused to inform counsel of the proposed charges, and closing argument was presented without such benefit. We also note that the transcript contains a notation "Jury Charges Given By The Court." However, the charges were not transcribed, and a copy of the written charges was not included in the appellate record.
Further, the transcript reflects counsel's objections to the trial judge's failure to give any charge whatsoever on the law applicable to the liability of a seller and his failure to give Boyce's suggested specific charge on products liability. As to the first objection the record does not show a response by the court, but the record does show the trial judge acknowledged the oversight and proceeded to give the jury the specific products liability charge suggested *548 by Boyce. Further, although the record shows counsel's objections to the court's failure to give all of Boyce's proposed charges and the court's "indiscriminate" use of the term "defendants" and its reference to the "unprecedented decline of the value of the dollar", the record does not reflect a response to these objections. Thus, although counsel for Boyce raised objections to charges given which may have been valid, in the absence of written charges we are unable to gauge the validity of the objections.
Further, La.C.C.P. Article 1793[1] provides that the court shall inform the parties of its proposed actions on written requests for specific jury charges and shall inform the parties of the instructions it intends to give to the jury at the close of the evidence or within a reasonable time prior to their arguments to the jury. Additionally, La.C. C.P. Article 1792(C)[2] mandates that the jury charges be in writing or recorded in the same manner as testimony taken in the case.
The uncertainty created in the polling of the jury, the failure to timely inform the parties of the intended jury charges in violation of La.C.C.P. Article 1793(B), the failure to follow the mandate of La.C.C.P. Article 1792(C) to have the jury charges in writing or transcribed as other testimony, and the resulting absence of jury charges from which we can gauge the validity of Boyce's objections taints the jury verdict and renders it suspect because there is no assurance its findings were made pursuant to a clear understanding of applicable legal principles. See Higgins v. Johnson, 349 So.2d 918 (La.App. 1st Cir.1977), writ denied 351 So.2d 161 (La.1977) and Landry v. St. Charles Inn, Inc., 446 So.2d 1246 (La. App. 4th Cir.1984). Under those circumstances the manifest error standard of review of a jury's finding does not apply. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975); McLean v. Hunter, 495 So.2d 1298 (La.1986). Although plaintiff's counsel's conduct does not appear to have the effect imparted to them by defendants' counsel, in view of our ruling not to give deference to the jury verdict, we need not consider defendants' contentions relative thereto.
Following the usual statement as to appearances of parties and their counsel, the trial court's written judgment provided:
"The verdict of the Jury now becomes the Final Judgment of this Court, and the dates within which an appeal can be perfected are triggered by receipt of this Judgment; namely,
A.) The jury returned a verdict establishing damages of $1,200,000 to the three survivors of Farrel Weber, Jr.;
B.) That Caterpillar Tractor Inc. was responsible for 20% of these damages;
C.) That Boyce Machinery Corporation was responsible for 10% of said damages;
D.) That Farrel Weber, Jr. contributed to his own injury in the amount of $10%; for which there is no recovery;
E.) That the Intervenor, Bayou Steel, was 60% responsible for the accident causing their employee's death; thus, Bayou Steel's payments under Title 23, which were stipulated to by counsel at the beginning of this Trial, shall be reduced by 60% as will any future payments found proper under law.
All Court costs and expenses of the Jury, as well as the expert witness fees assigned by the Court shall be pro-rated amongst the parties within the same limits of the assigned percentage of liability in the Jury verdict.

*549 JUDGMENT READ, RENDERED AND SIGNED this 21st day of June, 1988, Edgard, Louisiana."
Thus, the judgment did not state the nature of the obligation of the defendants, Boyce and Caterpillar, i.e., whether it was joint, divisible or in solido, nor determine how, if at all, the provisions of Civil Code Articles 2323 and 2324 applied to the case, or state the amount of the award to plaintiff, or whether the award was to bear interest. Although the trial judge may have intended to do something else, in the absence of these factors, the amount of the intended award to plaintiff is left open to speculation, i.e., was it 30% of total damages or 90% of total damages. The judgment appears to set the plaintiff's award at 30% of total damages and reduce the reimbursement claim of Bayou Steel for past and future payments of compensation benefits by the percentage of fault allotted to the employer by the jury. For reasons hereinafter shown, therefore, we also set aside the trial court's judgment. Since the record before us is complete, rather than remand for a new trial, we review the record without deference to the jury's findings and render a judgment on the merits.

FACTS
Farrel Weber, Jr. was a materials handler for Bayou Steel Corporation. Weber used forklifts to load finished steel products on flatbed trailers for shipment to customers. The steel products were maintained in various locations in the plant and were stacked in well-lit, open storage areas. Wooden dunnage (4" × 4" × 7' @ 50# each) was used to partition stacks of steel into smaller segments and to facilitate positioning of the forks under the stacks for lifting. On November 13, 1985 at 8:00 o'clock P.M., Weber was using a Caterpillar V300B forklift to load steel onto a flatbed truck operated by Alphonse Poche. After loading steel on the truck from one location, the truck and forklift were driven to another location near the rolling mill building. As Weber drove past the truck toward a stack of steel, Poche saw a sudden movement and turned toward it. He saw Weber laying motionless, on his back, on the ground, eyes opened, near the still moving forklift. Before Poche could render assistance he said the left rear tire of the forklift rolled over Weber's head and shoulder. Poche stopped the forklift and summoned help from other Bayou Steel employees.
Examination of the forklift revealed a piece of dunnage (4" × 4" × 7') was laying inside the operator's cabin. One end of the dunnage protruded from the right side of the cabin; the other end rested behind the operator's seat, which was on the left side of the cabin. The latter end was marked with flecks of a substance which appeared to be white paint and a single hair. Weber's white hard hat bore scrape marks on the right side. Loose dunnage was piled at the corner of a stack of steel approximately fifteen feet from where Weber's body lay. Tracks in the dirt indicated the forklift traversed the corner immediately before the truck driver saw Weber on the ground. From this evidence it was stated by a committee of Bayou Steel employees that the right front tire of the forklift struck the end of a piece of dunnage as Weber negotiated the corner. The dunnage was flipped into the operator's cabin through the doorway and struck the right side of Weber's hard hat. Weber then fell through the doorless opening on the left side of the forklift and into the path of the rear wheel. Due to the resulting damage to Weber's body, the coroner could not determine whether death was caused by the blow from the dunnage or the crushing force of the forklift. After a careful review of the testimony, particularly that of Poche, we conclude the accident occurred as stated by Poche, and that Weber was still alive when rolled over by the forklift.
The Caterpillar V300B forklift was purchased from Boyce by Bayou Steel in 1982. A Bayou Steel supervisor prepared the specifications required for the forklift and invited several companies to bid on the project. The V300B matched exactly the specifications desired by Bayou Steel. It is eight and one-half feet wide, nine feet high, and fifteen feet long (excluding the forks), with a vehicle weight of 30,000 pounds, and *550 a lifting capacity of 20,000 pounds. The model purchased by Bayou Steel was equipped with an enclosed cab with doors. However, at some time prior to the accident (when the weather was warm) Bayou Steel personnel removed the doors. The V300B was not equipped with seat belts, curved restraining seats, or other operator restraining devices. The doors were affixed to the door openings with easily removable pins. Although the maximum speed of a V300B is 15.5 miles per hour unloaded, in 1982 Boyce, at Bayou Steel's request, locked out the third gear, thereby reducing the forklift's maximum speed to 7.5 miles per hour.

FAULT OF CATERPILLAR, WEBER AND BAYOU STEEL
In Louisiana the principle of strict products liability is analogous to the principle of legal fault or strict liability underlying Civil Code Articles 2317-2322. As explained by the Supreme Court in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986) at pages 114-115, in a strict products liability case there are three independent theories of recovery against the manufacturer of a product:
"(1) A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product.
* * * * * *
(2) A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be.
* * * * * *
(3) Although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed."
Plaintiffs presented the case against Caterpillar on the theory the forklift design was defective because it failed to incorporate safety equipment (restraining seats and/or safety belts, and a pressure cut-off switch) and adequate warnings ("constructing a vehicle knowing it is susceptible to this type of accident and failing to properly warn or instruct the operator"). The presentation here was similar to the presentation followed in Ingram v. Caterpillar Machinery Corp., 510 So.2d 741 (La.App. 4th Cir.1987), reversed 535 So.2d 723 (La.1988) which involved the overturning of a M-80 forklift, crushing the operator to death. In Ingram, the jury in response to interrogatories found: (1) Ingram's death resulted from a defective condition in the forklift, i.e., failure to install safety equipment which would restrain the operator in the seat in the event of an overturn, (2) the defective condition made the forklift unreasonably dangerous to normal use, and (3) the defective condition existed at the time the forklift left defendant's control. The Fourth Circuit in a three-two decision concluded there was no factual basis for the jury's finding that the forklift was unreasonably dangerous in normal use and hence reversed the judgment rendered on the jury verdict.
The Supreme Court in Ingram granted certiorari particularly to consider the issue of the necessity of warning in that case. The court noted:
"The function of a forklift truck is to pick up, transport and stack loads at various heights, sometimes above the operator's head. Because of this function and because of the limited space in which the truck often operates, the trucks are generally narrow and tall.2 This design results in a high center of gravity and a corresponding lack of lateral stability, especially when the forklift is in motion. The lateral instability of a forklift increases with an increase in speed or during turns, or with an increase in the amount or the height of the load. In this 1980 accident, however, Ingram was traveling at a reasonable speed transporting a 900-pound load (slightly over *551 one-tenth of capacity) at a height of only fifty-two inches.
2 Forklifts vary in size, capacity, type of power and other features. The M-80 forklift at issue in this litigation was an electric-powered, cushion tire truck with a capacity of 8,000 pounds. Ingram's M-80 measured fifty-eight inches from the floor to the top of the guard and fifty-eight inches from the front to the rear wheels, had a forty-four-inch wheel base, and was capable of lifting a capacity load to eleven and one-half feet. This model had a top speed of 6.7 miles per hour, but only with a full load."
Then, based on expert testimony,[3] the Supreme Court in Ingram, supra, concluded Caterpillar reasonably rejected the installation of seat belts as a means of enhancing overall safety. It also concluded the use of a seat belt would not have prevented Ingram's death but nevertheless found liability as to the manufacturer Caterpillar because of its failure to warn "of the danger of jumping off in the event of an overturn of the forklift."
Here, for the reasons hereinafter stated, we find plaintiff's evidence preponderates in favor of a finding that the V300B forklift lacks adequate warnings about a danger related to product design. As a trier of fact, based on the dissimilarity of the forklift and record here, we may have reached a different conclusion than the Supreme Court, as the trier of fact, reached in Ingram. In view of our findings on the inadequate warnings, however, we do not discuss the alternative theories of products liability urged by the plaintiff.
A manufacturer is required to provide an adequate warning of any dangers inherent to the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Ingram, supra; Halphen, supra; "Normal use" is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product. Ingram, supra; Bloxom v. Bloxom, 512 So.2d 839 (La.1987).
The manufacturer is obligated to anticipate the environment in which the product will be used and to give notice of the potential risks arising from foreseeable use in the foreseeable environment. Bloxom, supra. A manufacturer may not shut his eyes to hazards associated with foreseeable misuse of the product, for the manufacturer is in the best position to avoid product related injuries by giving an adequate warning. Bloxom, supra. In performing this duty a manufacturer is held to the knowledge and skill of an expert; it must keep abreast of scientific knowledge, discoveries and advances and is presumed to know what is imparted thereby. Halphen, supra. Under the failure to warn liability theory, evidence as to the knowledge and skill of an expert may be admissible in determining whether the manufacturer breached its duty. Halphen, supra.
Here Weber was using the forklift to load a truck, a normal use. His carelessness in running over dunnage was foreseeable to the manufacturer. Virtually every use of the forklift would necessitate the use of spacers or pallets to facilitate positioning of the forks. It was inevitable that constant use of the forklift in such surroundings would lead to running over the spacers or pallets. The design of the forklift was such that it was possible for the spacer to be flipped up toward the cab.
It was likewise foreseeable to the manufacturer that a purchaser might remove the doors from the cab. The doors were secured only by pins and were designed for easy removal. The cab was located over the engine, facilitating a heat buildup which was exacerbated by the local climate. The cab was not equipped with an air-exchange or ventilation system. The doors were the only means of preventing objects from falling or flipping into the cab. Moreover, in the absence of restraining devices, the doors were the only means of preventing an operator from slipping or being knocked out of the seat and into the path of the rear wheels.
Caterpillar did not warn against the removal of the doors. Although appellate counsel contends the doors were not furnished as "safety devices," at least one *552 safety function they serve is punctuated by the expert testimony that if the doors were in place the dunnage would not have entered the cab and Weber would not have been injured. Given the overall design of the forklift, the manufacturer should have provided warnings against the removal of the doors. The danger inherent in removing the doors was not within the knowledge of or obvious to Bayou Steel. No similar incidents or "near misses" are reflected in the record. The lack of an adequate warning had a causal relationship with the injury, and it can be inferred that Bayou Steel would have heeded the warning not to remove the doors if it had been given. See e.g. Ingram, supra.
Nevertheless, the conduct of Weber and Bayou Steel played a part in this tragedy. Dunnage was scattered about the workyard at the time of the accident. Bayou Steel's policy required the forklift operator to neatly stack dunnage out of the way. The dunnage struck by the forklift was among a loosely scattered pile at the end of a stack of inventory, protruding near the forklift path. Although the area was "well-lit" Weber either failed to see the dunnage or misjudged the distance when negotiating the turn. Boyce had provided Bayou Steel with an instructional filmstrip warning of dangers associated with forklift operations. The filmstrip included a warning about running over objects on the ground.
The conduct of Weber and Bayou Steel were also contributing causes in Weber's death. Thus an apportionment of fault under our comparative negligence concept is required. Factors to be considered in the apportionment of fault are:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger,
(2) how great a risk was created by the conduct,
(3) the significance of what was sought by the conduct,
(4) the capacities of the actor, whether superior or inferior, and
(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Watson v. State Farm Fire and Casualty Co., 469 So.2d 967 (La.1985).
Weber's conduct resulted from carelessness or inattentiveness during routine employment procedures. There was a risk of harm to others (the truck driver) in that the dunnage could have flipped in any direction. Bayou Steel's conduct likewise resulted from carelessness in that it failed to maintain a safe workplace by allowing personnel to leave dunnage scattered about near or on the roadway. Caterpillar's fault lies in its failure to warn against a foreseeable but non-apparent use or misuse of the forklift, creating a risk of harm to all users of the product. We discuss further the apportionment of fault under the heading "Apportionment of Liability".

FAULT AND LIABILITY OF BOYCE MACHINERY
Unlike a manufacturer, the seller of a product is not presumed to know of its defects. La.C.C. Article 2531; Spillers v. Montgomery Ward & Company, Inc., 294 So.2d 803 (La.1974); General Accident Ins. v. Gillespie Lumber, 527 So.2d 1092 (La. App. 1st Cir.1988). However, a seller who knows or should know a product is defective "and omits to declare it" is answerable (to the buyer) in damages. La.C.C. Article 2545; Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978); Thomas v. W & W Clarklift, Inc., 444 So.2d 1300 (La.App. 4th Cir.1984), writ denied 448 So.2d 113 (La. 1984).
Nevertheless, a seller is not required to minutely inspect a product prior to a sale for non-apparent inherent defects, but is liable only for obvious and apparent defects, i.e., those discoverable by a simple inspection. Picolo v. Flex-A-Bed, Inc., 466 So.2d 652 (La.App. 5th Cir.1985) writ denied 467 So.2d 1134 (La.1985); Harris v. Atlanta Stove Works, Inc., 428 So.2d 1040 (La.App. 1st Cir.1983) writ denied 434 So.2d 1106 (La.1983); Harris v. Bardwell, 373 So.2d 777 (La.App. 2nd Cir.1979).
*553 Boyce Machinery sold the forklift manufactured by Caterpillar to Bayou Steel. Boyce had no imput into the design, testing, or manufacture of the forklift. Prior to delivery to Bayou Steel, Boyce checked the machine to insure it operated according to design specifications. Boyce delivered the machine with the doors in place. At some unspecified time Bayou Steel personnel removed the doors. Although Boyce personnel occasionally serviced the machine, nothing in the record indicates Boyce was aware the doors were periodically removed by Bayou Steel personnel.
The record is devoid of evidence that Boyce was aware of prior accidents similar to the present. Boyce cannot be charged with forecasting that at some point a buyer might decide to remove the doors and proceed to do so in the absence of contrary warnings. As discussed supra, the responsibility for such foresight lies with the manufacturer. The "defect" in the forklift was not discoverable by simple inspection; thus, there is no legal basis for imposing liability on Boyce.

APPORTIONMENT OF LIABILITY FOR PLAINTIFF AND INTERVENOR'S CLAIM
Under the concept of comparative negligence in effect in Louisiana on November 13, 1985 (the accident date) the percentage of fault allotted to a tortfeasor did not necessarily equate to the percentage of the injured person's damages the tortfeasor may be obligated to pay. Prior to the revision of Louisiana Civil Code Article 2323[4] any amount of contributory negligence barred recovery by the injured party. Since its revision, the injured party's total damages are to be reduced by the degree or percentage of negligence attributable to the injured party. Further, under the provisions of La.Civil Code Article 2324[5] although the tortfeasor's obligations are "in solido," where the injured party's recovery has been reduced by virtue of his contributory negligence, "a judgment debtor [concurring tortfeasor] shall not be liable for more than the degree of his fault to a judgment creditor [injured person] to whom a greater degree of negligence has been attributed ..."
Louisiana's concept of comparative negligence overlies the previously existing concept of worker's compensation benefits being paid without considering fault. Under the no-fault concept for payment of worker's compensation benefits the employer has immunity from tort liability, except for an intentional tort (LSA-R.S. 23:1032).[6] Thus presented squarely for *554 consideration is the effect Bayou Steel's contributory fault in the accident has on Weber's recovery from Caterpillar and on its own recovery for payment of worker's compensation benefits to Weber's widow and children.
In Franklin v. Oilfield Heavy Haulers, 478 So.2d 549 (La.App. 3rd Cir.1985) writs denied 481 So.2d 1330 (La.1986), in the trial court fault was apportioned at: -0- to Franklin, the employee; 40% to Cliff, the employer; and 40% and 20% respectively to the third party contractors, Oilfield and Hicks. The appellate court held that the employer's negligence could not be considered in determining comparative negligence since the employer was absolutely immune from any liability beyond its payment of worker's compensation benefits to the employee. Although the results leave the appearance of and have been criticized here as an injustice (the third party tortfeasor compensates the injured employee for the fault of the employer) under the statutory law in effect in Franklin and here, we believe the results were correct and consequently adhere to the rationale of the Franklin case, supra. See also Morrison v. J.A. Jones Const. Co., 537 So.2d 360 (La.App. 4th Cir.1989).
Thus, having absolved Boyce of fault and having decided that the contributory fault of Bayou Steel cannot be considered in applying the comparative negligence concept, we allot fault at 50% to Weber and 50% to Caterpillar. Thus, Caterpillar is obligated to pay 50% of the total damages. This brings us to the intervenors' claim for reimbursement of past due and future compensation benefits.
Prior to trial all parties entered into an "intervention stipulation" which provided:
"As a result of the death of Farrel Weber, Jr., funeral benefits in the amount of $3,000.00 and worker's compensation benefits in the amount of $254.00 per week were paid by intervenors to and/or on behalf of plaintiffs herein, all in accordance with their duties and obligations under the Louisiana Worker's Compensation laws. Further, the total amount paid by intervenors through June 8th, 1988 is $38,560.00.
In the event that there be judgment or settlement herein, in favor of plaintiffs, Coy V. Weber, individually and as administratrix of the Estate of her minor children, Farrel J. Weber, III and Britain F. Weber, and against defendants, Caterpillar Tractor Company and/or Boyce Machinery Corporation, then intervenors shall be entitled to recover out of the proceeds of such judgment or settlement, with preference and priority, those benefits previously paid to or on behalf of Coy V. Weber, individually and as administratrix of the Estate of her minor children, Farrel J. Weber, III and Britain F. Weber."
The question presented on appeal is the extent to which the recovery of intervenors is to be decreased as a result of the contributing fault of Weber and/or Bayou Steel.
Act 931 of 1985, effective September 6, 1985, amended LSA-R.S. 23:1101(B) to provide:
"Any person having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit against such third person to recover any amount which he has paid or *555 becomes obligated to pay as compensation to such employee or his dependents. The recovery allowed herein shall be identical in percentage to the recovery of the employee or his dependents against the third person and, where the recovery of the employee is decreased as a result of comparative negligence, the recovery of the person who has paid compensation or has become obligated to pay compensation shall be reduced by the same percentage." (Emphasis supplied)
The amendment makes it clear that the reimbursement to the intervenors must be reduced by the percentage of fault assigned to Weber. Chatelain v. Project Square 221, 505 So.2d 177 (La.App. 4th Cir.1987) writ denied 508 So.2d 71 and 508 So.2d 74, reconsideration denied 508 So.2d 813. However, not so clear is whether the reimbursement claim must be further reduced due to the contributing fault of Bayou Steel. The Federal Fifth Circuit, in Robertson v. Superior PMI, Inc., 791 F.2d 402 (5th Cir.1986), using the same rational as the State Third Circuit in the Franklin case, allowed full recovery to the employer notwithstanding contributory fault on the part of the employer. Although we might philosophically agree with the claim of unfairness, our function is to apply the applicable statutory provisions. Under these we hold, as did the Franklin and Robertson courts, that the reimbursement claim of Bayou Steel is not to be reduced for the contributory negligence of Bayou Steel.

DAMAGES
Farrel J. Weber, Jr.'s worklife expectancy was 35.8 years, his life expectancy 50.5 years. Weber's gross earnings from Bayou Steel were $1700.00 per month, and he earned additional income of $136.00 per month plus tips delivering pizza in his spare time. Ernest Huval, an actuary called by plaintiff and qualified as an expert in actuarial science, calculated past and future wage losses from Bayou Steel at $60,632.00 and $475,511.00 respectively, plus an additional 10% for income from delivering pizzas, for a total discounted wage loss of $589,757.30. In computing the present day value Huval allowed 4% per annum in salary increases and an investment interest rate of 7%.
Dr. J. Stuart Wood, an economist retained by Caterpillar and qualified as an expert in that field, computed Weber's past and future wage losses at $46,376.00, and $220,000.00 to $352,000.00 respectively.[7] This computation was based solely on Weber's income from Bayou Steel. Wood did not testify as to the manner in which the award was discounted to present day value. The written report prepared through the joint efforts of Wood, Kenneth J. Boudreaux, and James T. Murphy was not allowed into evidence because it was signed only by Boudreaux, who was not present at trial.
In consideration of the above enumerated factors, we find that Duval's estimate of wage losses is based on more complete information and the 4% per annum wage increase and 7% investment interest rates are reasonable. Moreover, it is better substantiated than Wood's estimate. Thus, we find that Weber's wage losses were $589,757.30.
Farrel J. Weber, Jr. died at the age of twenty-one. His widow was eighteen, his sons, Farrel, III and Britian, twenty-two and four months old, respectively. The Webers had purchased a new home two weeks before Farrel's death. Farrel was devoted to his wife and children. He did not use alcohol or tobacco, and attended church on a regular basis. Farrel was well liked in the community and was industrious.
Farrel's death imposed a severe emotional burden on the family. Farrel, III continually inquired as to when his father was coming home. Coy visited the grave daily for a two year period in an attempt to be near Farrel. She raised the children with the help from their grandparents.
*556 Farrel, III and Britian must live their entire lives without the emotional support, friendship, and love of their father. Coy must rebuild a life for herself and her children as best she can, and, in light of her youth, faces a veritable lifetime of pondering what might have been. We conclude that a proper award to each of the children for the loss of the love, affection, and companionship of their father is $150,000.00. A proper award to Coy for the loss of love, affection and companionship of her husband is $300,000.00.
Thus, the general and special damages suffered by the plaintiff totals $1,189,757.30.[8]

CONCLUSION
For the reasons above stated we render judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Coy V. Weber, individually and as administratrix of the estate of the minor children, Farrel J. Weber, III and Britian F. Weber, and against the defendant, Caterpillar Tractor Co., in the true and legal sum of Five hundred ninety-four thousand eight hundred seventy-eight and 65/100 ($594,878.65) Dollars, together with legal interest thereon from date of judicial demand until paid, less the amount awarded in the following paragraphs to intervenors, Bayou Steel Corporation and Home Insurance Company;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Bayou Steel Corporation and Home Insurance Company, intervenors, for 50% of the amount which the intervenors actually paid or will actually pay prior to the date of the satisfaction of this judgment to Coy V. Weber as worker's compensation death benefits, medical expenses, and funeral expenses, plus judicial interest on the amount of each payment until payment of the amounts awarded in this judgment, the sum to be paid to intervenors by preference and priority out of the award made herein to plaintiff Coy V. Weber.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all taxable costs, including expert witness fees and jury costs are to be fixed by the trial court and are to be apportioned 50% to Caterpillar and 50% to Weber and Bayou Steel. As between Weber and Bayou Steel, the costs allotted to them are to be borne in the same ratio as the total funds paid by Caterpillar in satisfaction of the judgment are divided.
SET ASIDE AND RENDERED.
BOWES, Judge, concurring.
Whereas I agree with the result reached by my colleagues in the majority, I do not agree with all of the statements made or theories set forth in the opinion.
Accordingly, I respectfully concur.
NOTES
[1] La.C.C.P. Article 1793 provides, inter alia,:

"A. At the close of the evidence, or at such earlier time as the court reasonably directs, a party may file written requests that the court instruct the jury on the law as set forth in the requests.
B. The court shall inform the parties of its proposed action on the written requests and shall also inform the parties of the instructions it intends to give to the jury at the close of the evidence within a reasonable time prior to their arguments to the jury."
[2] La.C.C.P. Article 1792(C) provides:

"This charge shall be in writing or recorded in the same manner as testimony taken in the case."
[3] As may be noted from footnote 7 at page 728 of the Ingram opinion, the Supreme Court noted that "The expert stated that seat belts may be useful in a very large forklift with a wide cab."
[4] Act No. 431 of 1979, effective August 1, 1980, introducing the concept of comparative negligence, revised La.C.C. Article 2323 to read as follows:

"When contributory negligence is applicable to a claim for damages, its effect will be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or precentage of negligence attributable to the person suffering the injury, death or loss."
[5] Act No. 431 of 1979, effective August 1, 1980, revised La.C.C. Article 2324. As of the accident date (November 13, 1985) Article 2324 read as follows:

"Liability for assisting or encouraging wrongful act. He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable in solido, with that person, for the damage caused by such act.
Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution."
[6] LSA-R.S. 23:1032 provides:

"The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease. For purposes of this Section, the word "principal" shall be defined as any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof.
Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.
The immunity from civil liability provided by this Section shall not extend to: 1) any officer, director, stockholder, partner or employee of such employer or principal who is not engaged at the time of the injury in the normal course and scope of his employment; and 2) to the liability of any partner in a partnership which has been formed for the purpose of evading any of the provisions of this Section."
[7] Wood also supplied computations of after tax wage losses. However, gross rather than net wages should be utilized when computing wage losses. Riley v. Winn-Dixie Louisiana, Inc., 489 So.2d 931 (La.App. 5th Cir.1986) writ denied 494 So.2d 329 (La.1986).
[8] Compare with Hellmers v. Dept. of Transportation & Development, 503 So.2d 174 (La.App. 4th Cir.1987) where minor children and a husband were awarded $225,000.00 and $325,000.00 respectively, for the loss of love, affection, and companionship of a mother/wife. The court affirmed the jury award. See also Ingram v. Caterpillar, supra, wherein a general damage award to the wife and two sons of the decedent, ages 15 and 12, totalled $500,000.00 and the total damage award was $1,175,000.00.