561 So.2d 175 (1990)
Anthony P. MITCHELL
v.
CLARK EQUIPMENT COMPANY, et al.
No. 89-CA-731.
Court of Appeal of Louisiana, Fifth Circuit.
April 11, 1990.
*176 Patrick D. McArdle, Laura E. Fahy, McArdle and Fahy, New Orleans, for plaintiff/appellee.
J. Mark Graham, Henderson, Hanemann & Morris, Houma, for defendants/appellants.
Janice B. Unland, Metairie, for intervenors/appellants.
Before GAUDIN, WICKER, and GOTHARD, JJ.
GOTHARD, Judge.
This suit arises from an accident on November 16, 1985, in which a worker was injured when a forklift he was driving overturned and landed on top of him.
The plaintiff, Anthony Mitchell, sued Clark Equipment Company, manufacturer of the forklift, and W.W. Clarklift, local distributor for the forklift. Mitchell's employer, Witco Chemical Corporation, and its insurer, Home Insurance Company, intervened for worker's compensation benefits paid. The jury found in favor of the plaintiff and made an itemized award totaling $463,702. That verdict was adopted by the trial judge. The jury found no liability on the part of the manufacturer, Clark Equipment Company, but allocated negligence to the other parties as follows:
 Anthony Mitchell 20%
 W.W. Clarklift Company 30%
 Witco Chemical Company 50%
The judgment ordered reimbursement of worker's compensation benefits to Home Insurance Company subject to reduction of the plaintiff's 20% contributory negligence. It was ordered further that, "The negligence of plaintiff's employer is not considered in the apportionment of fault and *177 therefore, defendant W.W. Clarklift is liable for 80% of the plaintiff's damages." Costs were apportioned according to the percentage of negligence attributed to Mitchell, Clarklift, and Witco.
Clarklift appealed and raised the following issues: 1) whether Clarklift was liable; 2) whether the court erred in apportioning Clarklift's liability vis-a-vis that of the plaintiff by assessing the employer's percentage of fault against Clarklift for purposes of the plaintiff's recovery; and 3) whether the award for future medical expenses and the general damage award were excessive. The intervenors, Witco and Home Insurance, have also appealed and ask this court to consider whether the court abused its discretion in ordering the intervenors to pay 50% of the costs. The plaintiff answered the appeal, seeking review of the award of future lost earnings.
Cause Of Accident
Anthony Mitchell, thirty-seven years old at the time of the accident, had been a welder for more than twelve years. He had previously worked as a pipe fitter and roofer, earned a high school diploma through GED, and served in the army for nineteen months. On Saturday, November 16, 1985, he was repairing a condensate line on overtime with another employee, Charles Morgan. We note at the outset that Morgan did not see the accident happen, nor did anyone else. Mitchell was using "Forklift # 2," one of three owned by Witco, to tow a portable gasoline arc welding machine. The forklift was Clark model number C500Y40, had been purchased from Clarklift in 1978, and had a 4000 pound capacity. The welding machine weighed about 200 pounds and was mounted on a two-wheel trailer equipped with a hitch.[1] Mitchell attached the trailer to the right hand blade of the forklift with a bolt, which fit through a hole that had been drilled through the blade and was secured below the joint of the trailer with a nut. He then began driving in reverse to pull the load. Mitchell testified that this was the customary way and only means of moving a welding machine around the yard.
Mitchell first drove the forklift very slowly over some railroad tracks. He described the accident as follows:
"I had my left hand on the left side of the steering wheel and I was looking backwards to operate the vehicle, the forklift."
. . . . .
"But after I got past the tracks, thats when I ... after my turn, I gave it the gas and the accelerator stuck."
. . . . .
"I had my hand on the left side of the wheel and I leaned down and I tried to pull the accelerator up with my right hand."
What happened then is not clear from his testimony, but the forklift began to go up a ramp, presumably because Mitchell was not in control, and somehow tipped over sidewards. Mitchell landed on the ground face down with the roll cage of the truck lying across his arm, pelvis, and back. He testified at first that the last thing he remembers is looking down at the accelerator pedal, but later testified that he was sitting up, holding the wheel as the forklift went over, trying to stay with the machine as previously instructed. In a deposition he had said he really did not know what he did other than to try to stay with the forklift. He stated that he believed he turned off the ignition but could not be sure. Morgan testified that when he came to the scene a few seconds later he found the ignition was indeed turned off.
The plaintiff alleges that Clarklift was negligent in failing to provide a safety seat for Witco's forklift # 2 and in causing the accelerator to stick by placing a tie mechanism in the accelerator system when it performed repairs on the machine.
In 1983, after extensive study of forklift accidents, Clark Equipment Company began making available an operator restraint system to owners of forklifts sold from
*178 1968 onward, as well as to new purchasers. The restraint consists of a lap belt and wing-shaped guards attached to the back of the seat at the operator's shoulder height. According to Clark Equipment's expert, its purpose is to contain the operator within the vehicle frame in an accident and for the "wings" to allow him to move sidewards and absorb some of the energy of the lateral tipover in his shoulders and over the entire length of his body, avoiding serious head injuries. The testimony of Witco employees indicates the company wanted the systems and requested them from Clarklift, but the system for forklift # 2 had not been delivered when Mitchell was injured. The sales representative, John Curry, called on Clarklift regularly, about ten times a year, and was responsible for identifying the machines that fell into the restraint program, filling in cards with the models and serial numbers, and passing the cards on to the service manager. He admitted having done this for Witco but could not remember when and did not recall any contact from Witco regarding nondelivery of a safety seat. Clifford "Butch" Ockman, superintendent of forklift maintenance at Witco, testified that Curry informed him of the retrofit program in April, 1984. As the company approved adoption of the restraints, he went around to the vehicles with Curry and saw him record the model numbers and serial numbers. At least one seat was delivered before the accident, and in the meantime the remaining forklifts were in operation without the seats and without incident. Ockman testified that he telephoned or spoke to Curry in person four or five times to inquire about the delivery of the seat for forklift # 2. He was told at various times that it was on back order, the factory was out of stock, or that Clarklift was too busy to do the installation. The seat was at last delivered after the accident, nearly two years after Witco requested it.
Clarklift denied that any action or inaction on its part was responsible for the delay in Witco's receiving the safety seat. It argues further that the jury's finding that "a defect of the manufacturer, Clark Equipment Company," was not a legal cause of Mitchell's injuries leads to the conclusion that the forklift without the restraining system was not unreasonably dangerous in normal use.
The plaintiff's expert, Glen Nelson, a consultant safety engineer, explained that forklifts are designed to fit through narrow aisles and to pick up and move loads at various heights. As they are usually narrow and tall, they are unstable vehicles, with a relatively high center of gravity. He testified that in his opinion the restraint system developed by Clark was an improvement over previous devices used in the industry and it would have reduced Mitchell's injuries.
Clarklift's expert, Frank Entwistle, a mechanical engineer formerly employed by Clark Equipment, testified at length about the development of Clark's safety system and expressed the opinion that if Mitchell had been belted in' and leaning over the accelerator pedal, he would not have been protected by the wing restraints. Mitchell asserts that, although he had been trying to release the accelerator, when the forklift began to go up the ramp he tried to "hold onto the lift, you know, hold tight to the steering wheel and stuff and just try to ride it out," but could not hold on. He asserts that since he was sitting up when the forklift actually turned over he would have been protected by the missing restraint system. The jury apparently was convinced that the absence of the restraint was a cause of Mitchell's injuries.
The evidence as to why the accelerator became locked is inconclusive. It is uncontested that Clarklift performed all major repairs on Witco's forklifts, while light maintenance and minor repairs were done at the plant. Butch Ockman testified that forklift # 2 was sent to Clarklift for work six or seven times in 1984 and 1985. In March, 1985 its accelerator pedal, bracket, pivot pin, and accelerator push rod had been replaced at Witco but no work was done on the accelerator linkage system. Immediately after the accident a Clarklift mechanic checked and tested the vehicle and found nothing wrong. Ockman and another plant mechanic found nothing *179 wrong, and the forklift was returned to service and traded in about eighteen months later.
Clark Equipment's expert mechanical engineer, James Bauer, inspected the forklift in June, 1987, after it had been traded, and discovered a plastic tie strap, not a Clark part, around the accelerator cable, which could have caused the accelerator to stick. The Witco employees denied having installed the tie or having seen it after the accident. Although Bauer testified that the tie appeared to have been there a long time, an inspection taking place more than a year and a half after the accident and after the vehicle had left the plant has little evidentiary worth. We assume the jury disregarded Bauer's testimony regarding the tie.
Another possibility, that tools carried by Mitchell could have jammed the accelerator, was explored. Clark Equipment's expert, Bauer, found that only by intentionally wedging a pipe wrench under the brake was he able to place it in a position where it held the accelerator pedal down; he did state that carrying tools on the floorboard was an unsafe practice. Mitchell stated that when he was pulling on the pedal he could see that the wrenches were out of the way.
A third possibility was voiced by Ockman, who described a prior occurrence of accelerator locking that was due to the rod's going off center and bending the spring. That problem was cured by simply pushing the rod back into position.
The experts, Bauer and Entwistle, agreed that the alteration of the forklift and attaching a trailer was an unsafe practice and that a forklift was not designed to pull a load. On the other hand, forklifts are designed to be driven both forward and in reverse. We conclude that towing in reverse was a cause of the accident. Witco no longer permits the use of its forklifts to tow loads.
The jury concluded that the lack of care of three parties, the plaintiff, Clarklift, and Witco, combined to cause the accident and the injuries to the plaintiff. As is well known, a jury's finding of fact may not be disturbed upon appeal unless it is clearly wrong. The Supreme Court, in Rosell v. ESCO, 549 So.2d 840 (La.1989), clarified the "manifestly erroneousclearly wrong" standard, as follows, at 844:
... The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, [Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) ] supra at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La. 1985). In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. [Citations omitted.]....
The jury assigned 20% fault to Mitchell. The record supports a finding that he was negligent in taking his eyes from the road while trying to release the accelerator manually. Ockman stated that there were other ways of stopping a runaway forklift, such as turning off the ignition at once. In the other occurrence of an accelerator's sticking at Witco, the driver had hit the clutch brake and stopped the vehicle; however, he was driving forward and not pulling a load. Tommy Tucker, a maintenance technician for Witco, testified that the best way to stop a forklift is to hit both brakes. Mitchell did not remember using the brakes.
Our review of the entire record indicates that the jury's findings as to fault were reasonable.
Apportioning of Liability for Purposes of Plaintiff's Recovery
Clarklift protests the court's allocation of the 50% fault of Witco to Clarklift *180 and its insurers, making it responsible for 80% of the judgment, when it was found by the jury to be only 30% at fault.
This court addressed the same issue in Weber v. Caterpillar Machinery Corp., 542 So.2d 544 (La.App. 5th Cir. 1989), writ denied 548 So.2d 332 and 334 (La.1989). In that case, the plaintiff, the employer, and the manufacturer were found at fault on appeal. The court explained that in a pure tort situation, under LSA-C.C. art. 2324[2] prior to its 1987 revision, three tortfeasors' obligations were "in solido," but would be apportioned according to their degrees of fault. However, at the time of the accident in this case and in Weber, where an employer was a tortfeasor, except for an intentional tort suit he had immunity for tort liability because of the no-fault provision payment of worker's compensation benefits. LSA-R.S. 23:1032. Accordingly, the employer's negligence could not be considered in determining comparative negligence. See Franklin v. Oilfield Heavy Haulers, 478 So.2d 549 (La.App. 3rd Cir. 1985), writs denied 481 So.2d 1330 (La. 1986). The Weber court, at 554, commented and we agree that:
... Although the results leave the appearance of and have been criticized here as an injustice (the third party tort-feasor compensates the injured employee for the fault of the employer) under the statutory law in effect in Franklin and here, we believe the results were correct and consequently adhere to the rationale of the Franklin case, supra. See also Morrison v. J.A. Jones Const. Co., 537 So.2d 360 (La.App. 4th Cir.1989).
Clarklift suggests that the percentage of Witco's fault be reallocated between the company and the plaintiff in the same ratio as the percentages of fault found by the jury, or by a new trial.
Although we choose to allocate fault without remanding for a new trial, we find no basis in the record for an allocation of more than 20% to the plaintiff. Accordingly, we affirm the judgment insofar as it holds Clarklift liable for 80% of the damages.
Damages
General damages. Clarklift asserts that the award of $400,000 in general damages is excessive.
The only medical witness was the plaintiff's orthopedic surgeon, Dr. Robert L. Mimeles, who testified as the treating physician and also as an expert. The plaintiff sustained a fracture of both bones in the left arm near the elbow and a fracture of the lowest part of the pelvis, the pubic rami, at the point where the sacrum meets the pelvis, i.e. the sacroiliac joint. He underwent surgery to stabilize the arm with plates and screws. Dr. Mimeles said that as a result of scar tissue the arm is less mobile, particularly as to turning the hand. He expects Mitchell to continue to have some pain with changes in atmospheric pressure and upon weight bearing. The pelvis healed with bed rest; however, the pelvis shifted and caused a shift of the ilio tibial band, a band of muscles over the hip. As a result, Mitchell's hip kept popping out of joint and caused abnormal friction and rubbing. In March, 1986, Dr. Mimeles performed surgery that partially relieved the problem. He wears a heel lift to keep the pelvis straight. Mitchell has had continuing back pain, which the doctor attributes to worsening arthritis in a sacroiliac joint. At the time of trial Mitchell had had two CAT scans, one of which showed a minimal bulge but showed no evidence of a ruptured disc. If Mitchell's pain increases he will recommend a back workup. If pain in the sacroiliac becomes intolerable a fusion of one or both joints will be considered. *181 Dr. Mimeles was of the opinion that whether or not he has surgery in the future Mitchell will have some pain every day. He recommends that Mitchell work in a setting where he can do some sitting and some walking, with no stooping, bending, or heavy lifting. Future surgery should not prevent his doing the same work he is doing now.
Mitchell's accident was very traumatic, as he lay with the roll cage on him for about five minutes. Morgan had raised it briefly with a pipe but had to let go. Other workers were able to move the forklift with blocks and another truck. While lying there Mitchell was convinced he would die. He was hospitalized two weeks, then was in bed at home several weeks, after which the hip problem began and surgery performed in March. He returned to work in August, 1986, to do bench welding. He testified that his arm hurts in cold weather and he has some limited motion. He is no longer able to work on his car or go duck hunting and cannot play ball with his young son for very long. Mrs. Kathy Mitchell testified that during the two weeks at the hospital he was in much pain. He developed fluid in the lungs, and a hematoma displaced his bladder so that he needed frequent catheterization. He continues to have "constant pain." He seems depressed and frustrated and does none of the jobs he used to do at home, such as grass cutting and gardening.
We find no error in the jury's award for pain and suffering, mental anguish, and disability.
Future medical expenses. The jury awarded future medical expenses of $50,000, which Clarklift considers excessive and without an evidentiary foundation. Clarklift suggests that the award should be reduced to $12,000, based upon Dr. Mimeles' estimate of hospital charges of $10,000 and a surgical fee of $1,500 to $2,000 for fusion of one or both sacroiliac joints. The plaintiff contends that if one takes into account the possibility of a sacroiliac fusion and also of a back fusion if a ruptured disc develops along with doctor's visits, tests, medications and orthopedic shoes, the award of $50,000 was not excessive for an estimated twenty-year working life before Mitchell retires. Mitchell argues further that a plaintiff should not be denied damages for future medical expenses because of the difficulty in establishing their nature and extent, and that medical costs have continued to rise. While we might make a lower award, considering Mitchell's continuing problems with his back and sacroiliac joints and mindful of the admonition in Rosell v. ESCO, supra, we are unable to say that the jury award was clearly wrong.
Future wage losses. The jury awarded $13,702 for future wage losses, exactly the amount stipulated by the parties. In answering the appeal the plaintiff seeks an increase.
At time of trial Mitchell was employed full time, making a higher hourly wage than before the accident but working overtime only rarely. He said that he is limited to shop work and fears that he may lose his job, as he feels that the company created a place for him. Sammy C. Scholle, the maintenance manager for Witco, testified that the plant had enough shop work for Mitchell to be very productive in his present job. However, if Mitchell became unable to tolerate standing for substantial periods there would be no job for him. The plaintiff's economic expert postulated a number of situations, from total disability to employment paying half his present wages, with discounted losses ranging from $484,767 to $220,000.
The problem is that one can only speculate when an economic loss might begin. The plaintiff contends that even though Mitchell is working now, he has lost the capacity to do heavy welding and to work the considerable amount of overtime he previously worked. He was the top welder in terms of overtime work before the accident. An injured worker's lost earning capacity is compensable. Folse v. Fakouri, 371 So.2d 1120 (La.1979). In the recent case of Lajaunie v. Central Louisiana Elec. Co., 552 So.2d 746 (La.App. 1st Cir. 1989), a worker was awarded $25,000 for loss of earning capacity, although he was employed in his old job after an accident.
*182 He was having difficulty performing and had to rest more often because of the residuals of his injury. The physician predicted that in the future he would be limited to sedentary work. In the case before us, the jury award of $13,702 appears low, but not so low as to constitute an abuse of discretion, and we affirm it.
Apportionment of Costs
The employer and intervenor appeal the court's apportionment of costs, which reads as follows:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiff Anthony P. Mitchell, defendant W.W. Clarklift, Inc. and Intervenor The Home Insurance Company and Witco Chemical Company, pay all costs in this matter in proportion to their negligence.
The worker's compensation statute makes no provision for payment of costs; consequently, the trial judge has broad discretion in taxing costs. La.C.C.P. art. 1920 provides:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
Witco's position is that the trial court's allotment of costs is not equitable. As the employer/intervenor was found to be 50% at fault, its allotment of costs is also 50%. Witco refers us to Moody v. Arabie, 498 So.2d 1081 (La.1986), which held that an employer who intervenes in its employee's third party suit is obliged to pay from its share of the recovery a part of the employee's necessary and reasonable costs of recovery, including attorney's fees.[3] The Moody court determined that:
When an employer pays compensation to a worker who has been injured by the wrongful act of a third person, the employer and the worker become co-owners of a property right consisting of a right to recover damages from the third person.
. . . . .
Applying this doctrine to the action and right against the third person, we conclude that, with respect to any cost necessary to the maintenance and conservation of the right, each co-owner is always obliged to contribute in proportion to his interest in the right, and that, with respect to any other litigation costs, each co-owner is responsible for his proportionate part of reasonable and necessary expenses and legal services that accrue to his benefit....
Moody v. Arabie, supra, at 1085.
The litigation costs were then allotted between the intervenor and the employee in the ratio that the amount of compensation paid or due at the time of recovery bore to the total recovery. A review of Moody v. Arabie, 485 So.2d 660 (La.App. 3rd Cir. 1986) and Moody v. Arabie, supra, indicates that the "costs" under consideration arose from the claim for the plaintiff's attorney's fees and expenses. In two cases which followed the Supreme Court's holding, Broussard v. Olin Corp., 546 So.2d 1301 (La.App. 3rd Cir.1989) and Eskine v. Regional Transit Authority, 531 So.2d 1159 (La.App. 4th Cir.1988), the Moody formula was applied to attorney's fees and expenses rather than to court costs.
We conclude that the holding of the Supreme Court in Moody v. Arabie, supra, does not apply to the assessment of court costs in this case and we find no abuse of the court's discretion in the allotment of court costs.
For the reasons assigned above, the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] James Bauer, a mechanical engineer, testified that the combined load of the gasoline arc welding machine and trailer was about 1500 pounds.
[2] Article 2324, in 1985 read as follows:

He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution.
[3] The plaintiff in the case before us did not pray for attorney's fees and they were not taxed as costs in the judgment.