610 So.2d 830 (1992)
Tammy Marie GROW, Individually and as Provisional Natural Tutrix of her Minor Daughter, Jessica Lynn Grow
v.
TRANSOCEAN CONTRACTORS, INC., Mission Insurance Company, Water Quality Insurance Syndicate and Certain Underwriters With Lloyds of London.
Kenneth J. CURTIS and Virgil Curtis
v.
TRANSOCEAN CONTRACTORS, INC., Mission Insurance Company, Water Quality Insurance Syndicate of New York and Certain Underwriters at Lloyds of London.
Nos. 91 CA 0558, 91 CA 1034.
Court of Appeal of Louisiana, First Circuit.
October 16, 1992.
Rehearing Denied January 11, 1993.
*831 Leo J. Landry, Judycki & Landry, Morgan City, for Tammy Grow and Kenneth and Virgil Curtis.
George W. Healy, III, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for Dennis Edward Jennings, as Rep. of Certain Underwriters Lloyd's London.
James M. Funderburk, Duval, Funderburk, Sundbery & Lovell, Houma, for intervenor-appellant Federated Rural Elec. Ins. Corp.
John Blackwell, Gibbens & Blackwell, New Iberia, and Andrew Meyers, Lafayette, for Transocean Contractors, Inc. and Nat. Union Fire Ins. Co. of Pittsburgh, Pa.
Before WATKINS, CARTER and FOIL, JJ.
CARTER, Judge.
These appeals arise out of a trial court judgment in actions for damages resulting from an accident which occurred in conjunction with the installation of a utility pole.

BACKGROUND
South Louisiana Electric Cooperative Association (SLECA) maintains electric distribution lines in various rural parishes in Louisiana. Shortly before the accident giving rise to the instant suits, SLECA decided to perform maintenance work on a certain power line in the area of Stephenville, Louisiana, because the poles were in poor condition and needed to be changed. The existing line crossed over a canal and a home. SLECA decided to relocate the line so that it did not cross over the home. SLECA's plan involved setting two 75' poles, one on each side of the canal. The pole on the west side of the canal was accessible by a roadway, and the pole on the east side of the canal was accessible only by water. SLECA contracted with Transocean Contractors, Inc. (Transocean) to transport the poles and to provide a crane to lift and set the poles in the holes to be dug by SLECA.
On or about May 24, 1983, Robert J. Aucoin and Kenneth Curtis, along with other employees of SLECA, went to the site in *832 Stephenville to prepare for the installation of the pole on the east side of the canal. The crew located the marking stakes previously placed by SLECA's engineering department and dug the hole into which the new utility pole would be placed. After digging several feet, the crew encountered roots in the ground. Thereafter, they attempted to dig a second hole adjacent to the first. Again, after reaching a depth of a few feet, the crew encountered more roots. The third and final hole was dug adjacent to the first two, resulting in an elongated trench. This hole was dug at a depth of nine to ten feet, a depth determined by the SLECA crew to be adequate.
The following morning, the Transocean crew arrived with the utility poles. Transocean's foreman, J.C. Naquin, left the barge and viewed the hole prepared by SLECA. Naquin had concerns about the depth of the hole, considering the length of the utility pole, and measured the hole. Finding the hole to be approximately six and one-half feet deep, Naquin voiced his concerns to the SLECA crew and to Aucoin in particular. Naquin was informed that SLECA had installed numerous poles in this fashion and that the hole was adequate. Thereafter, Naquin ordered the crane operator to lift the pole from the barge and install it in the SLECA hole.
Still concerned about the safety of the procedure utilized by SLECA, Naquin ordered the crane operator to maintain the crane line on the pole while he called for instructions from his superior. Naquin left the work area and telephoned the Transocean office in Amelia to advise them of his concerns. Naquin was told that, as he had advised SLECA personnel of his concerns and SLECA's response was that the hole was adequate, he should proceed to install the pole as directed by SLECA. When Naquin returned to the work area, SLECA personnel back-filled and tamped the hole surrounding the pole. SLECA personnel then climbed the utility pole and released the crane lines from the pole. The Transocean crew was then requested by SLECA to proceed across the canal to assist with the installation of the utility pole on the west side of the canal.
Later that afternoon while the Transocean barge and crew were assisting SLECA on the west side of the canal, Aucoin and Curtis climbed the pole previously installed. After the two men commenced the installation of the power lines, the pole began to fall. Both men rode the pole to the ground, but were unable to jump to safety before the pole struck the ground. As a result of this accident, Aucoin was killed, and Curtis sustained serious injuries.
On May 18, 1984, Tammy Marie Grow, individually[1] and as provisional natural tutrix of her minor daughter, Jessica Lynn Grow,[2] filed suit for damages for the death of Robert J. Aucoin. Named as defendants in Grow's petition, as amended, were Transocean, its insurer, National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union),[3] numerous other insurers, including Mission Insurance Company (Mission), Water Quality Insurance Syndicate (Water Quality),[4] Certain Underwriters at Lloyds of London (Lloyds),[5] and Dennis Edward Jennings, as representative of Certain Underwriters at *833 Lloyds (Jennings). Federated Rural Electric Insurance Corp. (Federated), SLECA's worker's compensation insurer, filed an intervention, seeking to recover against the named defendants the worker's compensation paid to the Grows.[6]
On May 24, 1984, Kenneth J. Curtis and Virgil Curtis filed suit for damages against many of the same defendants named in the Grow suit. Federated likewise intervened in the Curtis suit, seeking reimbursement for the worker's compensation benefits paid to the Curtises.[7]
Pursuant to a motion to consolidate, these actions were consolidated on June 23, 1987.
After trial, the trial court apportioned fault as follows:

 SLECA 70%
 Aucoin 16%
 Curtis 0%
 Transocean 14%

Accordingly, the trial judge determined that SLECA was 86% at fault and that Transocean was 14% at fault. The trial court also determined that Kenneth J. Curtis sustained damages of $1,157,391.57[8] and that his wife, Virgil Curtis, sustained damages of $50,000.00. Damages sustained by Jessica Lynn Grow totalled $134,633.60.[9] Accordingly, the trial court rendered judgment in favor of the plaintiffs and against National Union as follows:[10]
1. Kenneth J. Curtis for $862,421.70;
2. Virgil Curtis for $37,257.10; and
3. Tammy Marie Grow, on behalf of and as provisional natural tutrix of Jessica Lynn Grow, for $100,321.20. The trial court awarded the intervenor, Federated, 14% of the awards to plaintiffs for the worker's compensation benefits paid through the date of trial and a credit for 14% of any future worker's compensation payments to plaintiffs. Jennings, as representative of Certain Underwriters at Lloyds of London, was dismissed from the suit. Federated was cast for 86% of all costs, and National Union was assessed with the remaining 14% of the costs.

From this judgment, various parties appealed. Transocean,[11] National *834 Union.[12] Federated,[13] Grow, and the Curtises[14] appealed. Lloyds of London answered the appeals.[15] Numerous other answers to the appeals were also filed. Although *835 we will not address each error assigned by the various parties, the opinion adequately disposes of all issues raised in the appeals.

NEGLIGENCE OF THE EMPLOYER
Plaintiffs and Federated contend that the trial court's finding that SLECA, the employer of Curtis and Aucoin, was seventy percent (70%) negligent is contrary to the law and the evidence. They reason that, because SLECA is the employer of the injured workers, fault cannot be allocated to SLECA in a tort suit against third parties.
The Worker's Compensation system is characterized as a compromise between employer and employee. The employer gives up a determination that he was not at fault in a job-related accident, and the injured employee sacrifices a tort damage award against his employer, receiving only his wages and expenses. Franklin v. Oilfield Heavy Haulers, 478 So.2d 549, 556 (La. App. 3rd Cir.1985), writs denied, 481 So.2d 1330-31 (La.1986). LSA-R.S. 23:1032 addresses the exclusivity of a worker's remedies against his employer, in pertinent part, as follows:
The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease.
Indispensable to the worker's compensation bargain is the employer's freedom from tort liability for injury to his employee. This principle can be fully effectuated only if the employer is given absolute immunity at all levels. Thus, as between employer and employee, fault is not an issue. Franklin v. Oilfield Heavy Haulers, 478 So.2d at 556-57. The employee, however, retains his rights to tort recovery against a negligent third party. LSA-R.S. 23:1101.
The present actions involve tort suits by employees against third persons. In such actions, can an employer's negligence be considered? This issue has been addressed by the appellate courts of this state on numerous occasions and was recently considered by the Louisiana Supreme Court in Guidry v. Frank Guidry Oil Company, 579 So.2d 947, 953 (La.1991), wherein the court stated:
In the employee/employer bargain of a worker's compensation scheme, the employee surrenders the possibility of tort recovery for the certainty of compensation and the employer receives tort immunity in exchange for paying compensation." The claim of the employee against the employer is solely for statutory benefits; his claim against the third person is for damages. The two are different in kind and cannot result in common liability." Third-Party Action Over Against Workers' Compensation Employer, 1982 Duke L.J. 483, 488. The compensation principle is independent of fault.
Accordingly, the court held that the employer's negligence could not be considered in determining comparative fault because the employer is absolutely immune from any liability beyond its payment of worker's compensation benefits to the employee. See also Mitchell v. Clark Equipment Company, 561 So.2d 175, 180 (La.App. 5th Cir.1990); Weber v. Caterpillar Machinery Corporation, 542 So.2d 544, 554 (La.App. 5th Cir.), writs denied, 548 So.2d 332, 334 (La.1989); Franklin v. Oilfield Heavy Haulers, 478 So.2d at 556.
In the instant case, the trial judge allocated 70% of the fault to SLECA. The law is clear that the worker's compensation scheme does not envision the allocation of fault to the employer in an employee's tort suit against third parties. Therefore, we find that the trial judge erred in allocating fault to SLECA for its negligence.

NEGLIGENCE OF TRANSOCEAN
Transocean and National Union contend that the trial judge erred in determining *836 that Transocean was at fault in causing the accident.
Generally, negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. Dobson v. Louisiana Power and Light Company, 567 So.2d 569, 574 (La.1990); Barnes v. Thames, 578 So.2d 1155, 1165 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La.1991). Whether a particular risk is unreasonable is a difficult question which requires a balance of the intended benefit of the conduct with its potential for harm and the cost of prevention. Socorro v. City of New Orleans, 579 So.2d 931, 939 (La.1991). In Dobson v. Louisiana Power and Light Company, 567 So.2d at 574-75, the Louisiana Supreme Court held that the test for determining whether a risk is unreasonable is supplied by the "Hand formula," which provides as follows:
The amount of caution "demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest he must sacrifice, or the cost of the precaution he must take, to avoid the risk." If the product of the likelihood of injury multiplied times the seriousness of the injury exceeds the burden of the precautions, the risk is unreasonable and the failure to take precautions or sacrifice the interest is negligence. (citations omitted)
Under the duty-risk analysis in negligence actions, for liability to attach, the plaintiff must establish that:
1. The conduct of which plaintiff complains was a cause in fact of the harm;
2. The defendant owed a duty to the plaintiff;
3. The duty owed was breached; and
4. The risk of harm caused was within the scope of the breached duty.

Socorro v. City of New Orleans, 579 So.2d at 938-39; Fox v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 576 So.2d 978, 981 (La.1991); Vicknair v. Hibernia Building Corp., 479 So.2d 904, 908 (La. 1985); Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1370 (La.1984); Stephens v. Pacific Employers Insurance Company, 525 So.2d 288, 289-90 (La.App. 1st Cir.), writ denied, 532 So.2d 116 (La. 1988). The existence of a duty is a question of law for the judge to decide, and the other inquiries are questions of fact for the factfinder, be it judge or jury. Wilson v. State, Department of Public Safety and Corrections, 576 So.2d 490, 493 (La.1991).
A defendant's conduct is actionable under the duty-risk analysis where it is both a cause in fact of the injury and a legal cause of the harm incurred. Sinitiere v. Lavergne, 391 So.2d 821, 825 (La. 1980); Fowler v. State Farm Fire & Casualty Insurance Co., 485 So.2d 168, 170 (La.App. 2nd Cir.), writ denied, 487 So.2d 441 (La.1986). The cause in fact test requires that but for the defendant's conduct, the injuries would not have been sustained. The legal cause test requires that there be a substantial relationship between the conduct complained of and the harm incurred. Sinitiere v. Lavergne, 391 So.2d at 825-26; Fowler v. State Farm Fire & Casualty Insurance Co., 485 So.2d at 170.
In the instant case, the trial judge specifically determined that the Transocean foreman, J.C. Naquin, acted as a reasonably prudent person and that none of the on-site employees of Transocean was negligent. Despite this finding, the trial judge determined an unknown and unnamed Transocean supervisor, who failed to drive to the site, was negligent, resulting in a finding of liability on the part of Transocean.
The testimony at trial revealed that there was no written contract between SLECA and Transocean. Prior to entering into a verbal agreement with Transocean, SLECA requested that Transocean provide a bid for a turn key project for the installation of the utility poles. When Transocean submitted its bid, SLECA rejected the bid because of the high costs. Thereafter, Transocean's time and materials. Under the agreement, Transocean was to work on an hourly basis and provide a barge and a three-man crew.
*837 It is undisputed that SLECA's engineering department prepared a staking sheet for the project and that its personnel selected the site, determined the specifications, dug the hole into which the utility pole would be placed, made the decisions to deviate from the specifications called for in the staking sheet, and tamped and back-filled the hole once the pole was set. The staking sheet called for the installation of bulk shoes (a stabilizing device), but the SLECA crew on the east side of the canal failed to install this assembly. The evidence also suggested that, despite the availability of the staking sheet, the SLECA crew commenced the installation of the utility pole without viewing the staking sheet.
Charles B. Clark, who was a district manager for SLECA at the time of the accident, testified via deposition. Clark testified that the relocation of power lines generally commenced with the preparation of specifications by the engineering department. These specifications included, among other things, the height of the poles. The general rule of thumb was that the pole should be buried at a depth equal to ten percent of the length of the pole plus two feet and that a seventy-five foot pole should be buried to a depth of nine and one-half feet. However, Clark acknowledged that a line foreman would have the authority to vary from that depth. Clark testified that when SLECA hired equipment and operators to work with a SLECA crew, the contracted operators took their orders from the SLECA line foreman.
Clark further testified that, shortly after the accident, he prepared a letter to the Rural Electrification Administration explaining the causes of the accident. Clark identified the failure to have guy lines, the failure to require that the pole be driven as opposed to being placed in a hand-dug hole, the softness of the ground, and the additional weight of more than one man on the pole as having caused the accident.
Howard Johnson was the SLECA foreman in charge of the installation of the pole in May of 1983. According to Johnson, his crew's job was to prepare the hole, and Transocean was present to transport the pole on their barge and to set the pole. Although Johnson was present when his crew dug the hole to a depth of eleven to twelve feet, Johnson was not present the following morning when the pole was placed in the hole and the installation was completed. In Johnson's absence Aucoin was in charge of the SLECA operation, and Johnson advised Aucoin to make certain everything was done properly. Johnson acknowledged that Aucoin was knowledgeable and should have been able to determine whether the pole was placed deeply enough into the hole. Johnson also acknowledged that although the plans and specifications required the installation of a bulk shoe, one was not installed.
Although Johnson was not present at the time the pole was placed in the hole, he arrived at the scene an hour or more before the accident. He did not see anything wrong with the manner in which the pole had been installed during his absence.
Kenneth J. Curtis testified that at the time of the accident he was a first class lineman with almost seventeen years of experience with SLECA. Curtis testified that he, Aucoin, Randolph Short, and Johnson dug the hole approximately ten to thirteen feet deep. When they installed the pole in the hole, according to Curtis, the pole went into the ground at least ten feet.
Randolph Short, a SLECA helper who assisted with the installation of the pole, testified that he did not believe that the pole was safe. Short testified that, prior to the accident, he discussed his concerns about the condition of the pole with Aucoin.
J.C. Naquin, barge foreman for Transocean, testified that his job was to pick up and set the utility pole into the hole, which was to be dug by SLECA. After the SLECA crew dug the hole, Naquin left the barge and viewed the hole. Naquin believed that the hole was approximately six and one-half feet deep and discussed his concerns that this depth was insufficient with the supervisor of the SLECA crew. The SLECA supervisor indicated that he had previously deviated from the specifications regarding the depth of the hole and *838 that he was authorized to make such determinations.
Naquin also contacted the Transocean office and spoke with his superior. The Transocean superior advised Naquin to defer to SLECA's expertise and to complete the job as directed by the SLECA foreman. Although Naquin persisted with his inquiries into the adequacy of the depth of the hole, the SLECA personnel did not appear to believe that the pole would be unsafe in a hole of that depth. Naquin testified that he performed every task requested of him and his crew by SLECA in the manner he had been requested.
Ronald J. Boutte, crane operator for Transocean, testified that Transocean's job was to lift the pole and set it in the hole prepared by SLECA. Boutte testified that, after Naquin expressed his concerns about the depth of the hole, someone from SLECA advised him that everything was fine and to release the pole. According to Boutte, he and the other members of the Transocean crew performed every task requested of them by SLECA and did not do anything they were not instructed to do.
Simon J. Freyou, consulting civil engineer, testified on behalf of Transocean and National Union. Freyou testified that the pole fell because of the condition of the back-fill and the failure to install the bulk shoe. Freyou testified that, although the pole should have been set in an eleven-foot hole, the installation of the bulk shoe probably would have prevented the accident. Moreover, Freyou determined that the staking sheet should have required the use of guy wires and that the specifications provided by SLECA's engineering department were deficient in that respect. With regard to the actions by Transocean personnel, Freyou opined that the crane operator conducted his function in a safe manner in that he successfully lifted and set the utility pole without incident.
Dennis Howard, an expert in industrial safety, testified that the Transocean personnel acted prudently in advising the onsite SLECA crew of the concerns regarding the depth of the hole. Howard determined that Transocean did not perform its job in an unsafe manner and that Naquin went above and beyond the normal and reasonable measures to perform the job safely.
John Kern, an expert in marine and industrial safety, testified that unless a crane operator is confident that safety is assured, he should shut down the operation. Kern opined that the Transocean supervisor should have come to the scene when he received the telephone call from Naquin regarding the possible safety problem and that the crane operator and crane foreman were negligent for failing to assure the safe installation of the pole.
We have carefully reviewed the entire record in this matter and have given great deference to the trial court's determination that the on-site Transocean personnel were not negligent. The trial judge, in his reasons for judgment, stated that Naquin acted properly and as a prudent person and that he did more than was required of him at the time of the accident. We agree. However, we find that when the trial judge determined that the Transocean supervisor, who advised Naquin to follow SLECA's direction, was negligent for failing to drive to the scene of the accident, he committed clear error; the determination simply is not supported by the record. Transocean was under no duty to provide a supervisory function over the SLECA project. Transocean was hired to transport, lift, and set the utility poles into the holes prepared by SLECA. SLECA was responsible for all other aspects of the job. Naquin advised the on-site SLECA personnel of his apprehension about the depth of the hole into which the pole was set. SLECA's personnel at the accident site, who were instrumental in the installation of the utility pole and who were experienced in the installation of utility poles, did not express or perceive any danger in the manner in which the pole had been erected sufficient to prevent them from climbing the pole. The Transocean supervisor, who deferred to the expertise of SLECA personnel, did not have an affirmative duty to personally drive to the site to over-see SLECA's performance of its obligations under the arrangement with Transocean.
*839 Therefore, the trial court judgment finding Transocean at fault is clearly wrong and must be reversed.
Because of our determination that the trial court erred in finding that Transocean was at fault in the accident, we find it unnecessary to address the other issues raised by the parties.

CONCLUSION
For the above reasons, the judgment of the trial court is reversed. Costs are assessed against plaintiffs and Federated.
REVERSED.
NOTES
[1] In her petition, Tammy Grow requested damages for her own losses for the death of Robert J. Aucoin. Although she and Aucoin were never married, Grow alleged that she and Aucoin had lived in open concubinage as man and wife from June of 1981 until his death. Pursuant to a consent judgment dated October 6, 1989, Grow dismissed her individual claims against Transocean, and her claims against National Union were dismissed pursuant to a consent judgment dated December 18, 1989.
[2] Jessica Lynn Grow was born to Tammy Marie Grow on December 7, 1982, during the time Aucoin and Grow lived together. By judgment of filiation dated October 11, 1983, Jessica Lynn Grow was recognized as the natural child of Robert J. Aucoin.
[3] The National Union liability policy excludes coverage for damages arising out of the ownership, maintenance, operation, or use of a watercraft.
[4] Pursuant to a motion and order to dismiss, Water Quality was voluntarily dismissed on December 18, 1989.
[5] The Lloyds policy provided excess watercraft liability coverage to Transocean.
[6] The parties filed numerous other pleadings, none of which are pertinent to the issues raised on appeal.
[7] The parties to the Curtis suit also filed numerous other pleadings, none of which are pertinent to the issues raised on appeal.
[8] The trial judge itemized Kenneth J. Curtis's damages as follows:

Past medical expenses $ 35,683.57
Future medical expenses $ 15,000.00
Past lost wages $202,048.00
Future lost wages $271,030.00
Past and future lost fringe
benefits $ 83,626.00
Past, present, and future pain
and suffering $350,000.00
Past, present, and future mental
anguish $200,000.00

[9] Damages to Jessica Lynn Grow were itemized, in proportion to the percentage attributable to Transocean's fault, as follows:

Pain and suffering
 ($200,000) $ 28,000.00
Loss of love and affection
 ($250,000) $ 35,000.00
Loss of support $ 50,000.00
Medical and funeral expenses $ 21,633.60

[10] The parties stipulated that orders issued by the United States Bankruptcy Court decreed that the plaintiffs' recovery from Transocean was limited to the proceeds of available insurance. The trial court determined that the only available insurance providing coverage to Transocean was the National Union policy, which had policy limits of $1,000,000.00. The trial judge prorated plaintiffs' recovery based on these policy limits.
[11] Transocean appealed, assigning the following errors:

1. The finding by the lower court that there was a causal connection between the acts and omissions of Transocean and the accident are clearly erroneous because the only testimony at trial was that the pole fell due to the failure of the SLECA crew to install the pole key assembly and the failure of the SLECA engineering department to require the installation of guys, neither of which were Transocean's responsibility.
2. The lower court committed error in finding that Transocean was under a duty to intervene in the operations of the owner/contractor to correct a defect arising solely in the context of the operations of the owner/contractor and presenting a danger only to the employees of the owner/contractor.
3. The lower court committed error in finding that Transocean was at fault because Transocean's supervisor did warn SLECA of his belief the hole was not deep enough.
4. The lower court committed error in failing to find that the sole cause of the fatal injuries to Robert Joseph Aucoin was his own negligence.
5. The trial court committed error in failing to find that the sole cause of the injuries to Kenneth Curtis was his own negligence.
6. The lower court committed error in assigning 14% of the fault for the accident to Transocean.
7. The lower court abused its much discretion in awarding $550,000.00 in general damages to Kenneth J. Curtis.
8. The lower court abused its much discretion in awarding to Tammy Marie Grow as the Natural Tutrix of Jessica Lynn Grow for the death of Robert Joseph Aucoin damages of $200,000.00 for conscious pain and suffering for 9 hours and $250,000.00 for loss of love and affection.
[12] National Union assigned the following errors:

1. The trial court erred in finding that an unknown supervisor of Transocean Contractors, Inc. who was not present at the job site was negligent accounting for fourteen percent of the fault with respect to the accident of May 25, 1983.
2. The trial court erred in finding that plaintiff, Kenneth Curtis, was not guilty of contributory negligence proximately causing, in any degree, the accident, despite plaintiff's extensive experience and involvement with the preparations for, and installation of the pole and voluntarily climbing the pole in question after installation.
3. The trial court erred in finding that Robert Aucoin's fault was only sixteen percent as respects the referenced accident, despite Aucoin's extensive experience and involvement with the preparations for, and installation of the pole and voluntarily climbing the pole in question after installation.
4. The trial court erred in finding that insurance coverage existed for Transocean Contractors, Inc. pursuant to the policy issued by National Union Fire Insurance Company of Pittsburgh, PA despite the watercraft exclusion contained therein.
[13] Federated specified the following errors:

1. The Trial Court's allocation of negligence, including the finding that plaintiff's employer, South Louisiana Electric Cooperative Association (SLECA), was seventy per cent (70%) negligent is clearly contrary to the law and the evidence.
2. The Trial Court also erred, as a matter of law, in finding that decedent, AUCOIN, was sixteen per cent (16%) negligent.
3. The Trial Court erred, as a matter of law, in holding that defendant, TRANSOCEAN, was only fourteen per cent (14%) negligent. 4. The Trial Court, because of the foregoing errors of law, erred in reducing the recovery of plaintiffs and intervenor to only fourteen per cent (14%) rather than a full recovery, as required by the well settled law in existence on the date of this accident, May 25, 1983.
5. The Trial Court erred for reducing the recovery of the intervenor based on the negligence of plaintiff's employer, SLECA.
6. The Trial Court erred for not holding that SLECA, the employer of plaintiffs, was immune from tort liability and therefore could not be negligent as a matter of law.
[14] Grow and the Curtises assigned the following errors:

1. The trial court erred when it assigned a percentage of fault to the employer, SOUTH LOUISIANA ELECTRIC COOPERATIVE ASSOCIATION (SLECA), who was not a party to this litigation.
2. The trial court erred when it determined that the negligence of TRANSOCEAN CONTRACTORS, INC. was "land based" only and dismissed the defendant, DENNIS EDWARD JENNINGS, as Representative of CERTAIN UNDERWRITERS AT LLOYDS, LONDON (LLOYDS OF LONDON), from this suit after submission of post-trial memorandum holding that his defendant's policy of insurance provides excess liability coverage for "watercraft" only.
3. The trial court erred when it found contributory negligence on behalf of ROBERT JOSEPH AUCOIN, in a percentage (16%) greater than the percentage (14%) negligence attributable to the defendant, TRANSOCEAN CONTRACTORS, INC.
4. The trial court erred in the amount of damages awarded to all of the plaintiffs-third appellants in that the damages awarded to the plaintiffs-third appellants were insufficient and should therefore be increased.
[15] Lloyds assigned the following errors:

1. The trial court erred in finding any fault on the part of Transocean.
2. The trial court erred in finding that plaintiff Kenneth J. Curtis was not contributorily negligent, despite Curtis' experience and his extensive involvement in the installation of the pole.
3. The trial court erred in finding that Robert Aucoin was only 16% contributorily negligent, despite Aucoin's experience and his extensive involvement in the installation of the pole.
4. The trial court abused its discretion in awarding $550,000.00 in general damages to Kenneth J. Curtis.
5. The trial court abused its discretion in awarding $200,000.00 in damages for Robert Aucoin's conscious pain and suffering and $250,000.00 in damages for Tammy Marie Grow's loss of love and affection.